JOHN SALORIO, ROBERT COE AND JOHN D. McGARR, JR., PLAINTIFFS-APPELLANTS, v. SIDNEY GLASER, DIRECTOR OF THE DIVISION OF TAXATION, DEPARTMENT OF THE TREASURY OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued November 14, 1979—Decided March 26, 1980.

484

*Adrian M. Foley, Jr.,* and *Max Gitter* a member of the New York Bar, argued the cause for the appellants (*Connell, Foley & Geiser,* attorneys; *Max Gitter* and *Mark C. Morril* members of the New York Bar and *Adrian M. Foley, Jr.,* and *Kevin J. Coakley,* of counsel and on the briefs).

*Stephen Skillman,* Assistant Attorney General, argued the cause for the respondent (*John J. Degnan,* Attorney General of New Jersey, attorney; *Stephen Skillman,* Assistant Attorney

General, *Herbert K. Glickman* and *Joseph C. Small*, Deputy Attorneys General, on the brief).

The opinion of the Court was delivered by

PASHMAN, J.

I

This case presents for review the constitutionality of the Emergency Transportation Tax (ETT) Act, *N.J.S.A.* 54:8A-1 *et seq.*

Plaintiffs,[1] three New York residents who commute or have commuted from their homes in New York to work in New Jersey, claim that since the ETT is paid solely by New York residents, it impermissibly discriminates against them in violation of the Privileges and Immunities and Equal Protection Clauses of the Federal Constitution. *U.S.Const.*, Art. IV, § 2, cl. 1; Amend. XIV, § 1. The State argues that imposition of the tax is justified by the existence of a "transportation emergency."

Plaintiffs filed suit in the Superior Court, Chancery Division, on June 8, 1977, seeking declaratory and injunctive relief from imposition of the tax. They also demanded damages in the amount of all monies paid to New Jersey pursuant to the ETT.[2]

The taxpayers and the State filed cross motions for summary judgment. On plaintiffs' motion, the court agreed to hear the matter as a summary proceeding without oral testimony pursuant to *R.* 4:67. Taking issue with plaintiffs' contention that the tax statute was facially unconstitutional under *Austin v. New Hampshire*, 420 *U.S.* 656, 95 *S.Ct.* 1191, 43 *L.Ed.*2d 530 (1975), the State requested an opportunity to develop and introduce

---

[1] John Salorio, John D. McGarr, Jr., and Robert Coe.

[2] Since the issue was neither briefed nor argued, we do not address the extent of the State's liability, if any, for money damages.

evidence that a "transportation emergency" justified the disparate treatment of non-residents. The parties took depositions of the plaintiffs and various State officials. The State also submitted documentary material regarding a 1962 taxation accord between New York and New Jersey (hereinafter the Accord).

In a letter opinion, the trial court declared the tax constitutional. According to the court, the sole issue presented by the plaintiffs under the Privileges and Immunities Clause was "whether or not the *Austin* case is dispositive of [the validity of] the legislation." Finding that a transportation crisis did in fact exist, and comparing the total tax liabilities of New Jersey residents to that imposed by New Jersey on commuters from New York, the court concluded that the criterion of "substantial equality" enunciated in *Austin* was satisfied. See 420 *U.S.* at 665, 95 *S.Ct.* at 1197, 43 *L.Ed.*2d at 537. The court further held that even if there were no distinctions between the present case and *Austin* based on the states' justifications for their respective taxes, the 1962 Accord was sufficient to validate New Jersey's taxation scheme.

Addressing plaintiffs' claim under the Equal Protection Clause, the court noted that in economic matters a statute need only bear some rational relation to a legitimate governmental objective. In the area of tax policy, the Legislature enjoys particularly broad discretion. Having found a proper governmental purpose, the court sustained the tax. The court did not determine whether the Act was unconstitutionally applied by reason of misappropriation of ETT receipts. Noting that the Act itself "contains the internal safeguards" to insure that tax monies would be spent exclusively to alleviate the State's "transportation emergency," the court remanded plaintiffs to the remedies provided by the statutory scheme. It accordingly entered judgment in favor of the State.

Plaintiffs appealed from the judgment of the trial court. While the appeal was pending unheard in the Appellate Division, plaintiffs filed a motion for direct certification pursuant to

*R.* 2:12–2. This Court granted plaintiffs' motion 81 *N.J.* 269 (1979). We now vacate the trial court judgment and remand the matter for proceedings consistent with this opinion.

## II

### *Standing*

An initial question arises as to plaintiffs' standing to bring this action. The record discloses that each of the plaintiffs either has paid or continues to pay emergency transportation taxes to New Jersey.[3] However, since New York grants its residents a credit for income taxes paid to other states, any reduction in tax liability to New Jersey will result in an equal increase in tax liability to New York. See *infra* at 497–498. Thus plaintiffs would not gain financially from a judgment in their favor. Emphasizing this apparent lack of economic harm and the fact that the State of New York is financing the present litigation, the State argues that plaintiffs do not have sufficient interest in the case and that New York is the "real party in interest."

 Despite the fact that plaintiffs' total tax obligation may remain unchanged, we conclude that they have standing to challenge the constitutionality of the ETT. It is important to recognize that New Jersey State courts are not bound by the "case or controversy" requirement governing federal courts, *U.S.Const.*, Art. III, § 2. See *Crescent Park Tenants Ass'n v.*

---

[3]Plaintiff John Salorio filed non-resident returns during the years 1972 through 1976 and paid from $1,493 to $2,467 per year in emergency transportation taxes. Plaintiff Robert Coe currently has emergency transportation taxes withheld from his income. Plaintiff John D. McGarr, Jr. filed non-resident returns for 1975, 1976 and 1977, paying $1,903, $2,734 and $4,096 respectively, in emergency transportation taxes. A portion of emergency transportation taxes paid by Salorio and McGarr on income earned after the effective date of the Gross Income Tax Act, *L.*1976, *c.* 66, *N.J.S.A.* 54A:1–1 *et seq.* (effective August 17, 1976) was allocated as receipts under the latter tax. See *N.J.S.A.* 54:8A–121; *infra* at 499–500.

*Realty Eq. Corp. of N. Y.*, 58 *N.J.* 98, 107–108 (1971). Our State Constitution contains no analogous provision limiting the subject-matter jurisdiction of the Superior Court. See *N.J.Const.* (1947), Art. VI, § 3, par. 2. This Court remains free to fashion its own law of standing consistent with notions of substantial justice and sound judicial administration. We therefore find it unnecessary to consider whether federal standing requirements have been met.[4]

We have consistently held that in cases of great public interest, any "slight additional private interest" will be sufficient to afford standing. *New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n*, 82 *N.J.* 57, 68–69 (1980); *Home Builders League of South Jersey, Inc. v. Tp. of Berlin*, 81 *N.J.* 127, 132 (1979); *Terwilliger v. Graceland Memorial Park Ass'n*, 35 *N.J.* 259, 268 (1961), aff'g 59 *N.J.Super.* 205, 215 (Ch.Div.1960); *Elizabeth Federal Savings & Loan Ass'n v. Howell*, 24 *N.J.* 488, 499 (1957); *Al Walker Inc. v. Bor. of Stanhope*, 23 *N.J.* 657, 660–666 (1957); *Driscoll v. Burlington-Bristol Bridge Co.*, 8 *N.J.* 433, 476 (1952), *cert.* den., 344 *U.S.* 838, 73 *S.Ct.* 25, 97 *L.Ed.* 652 (1952); *cf. Hudson-Bergen County Retail Liquor Stores Ass'n v. Bd. of Comm'rs of Hoboken*, 135 *N.J.L.* 502 (E & A 1947). A sufficient private interest exists in this case. If successful, plaintiffs would enjoy the benefit derived from the use of any funds recovered from the State of New Jersey prior to the time such monies may have to be remitted to New York. As New York residents, they would also share in the possible beneficial effect that a resulting

---

[4]We also recognize that on review, the United States Supreme Court " 'must determine for itself the sufficiency of the allegations displaying the right or defense, and is not concluded by the view taken of them by the state court.' " *Allied Stores of Ohio, Inc. v. Bowers*, 358 *U.S.* 522, 525, 79 *S.Ct.* 437, 440, 3 *L.Ed.*2d 480, 483–484 (1959) (quoting *First Nat'l Bank v. Anderson*, 269 *U.S.* 341, 346, 46 *S.Ct.* 135, 137, 70 *L.Ed.* 295 (1926) and *Staub v. Baxley*, 355 *U.S.* 313, 318, 78 *S.Ct.* 277, 280, 2 *L.Ed.*2d 302 (1958)).

increase in tax revenue to New York might have on future New York tax rates.[5]

As the trial court noted, the United States Supreme Court has rejected the State's theory that New York and not the plaintiffs is the "real party in interest." In *Pennsylvania v. New Jersey*, 426 *U.S.* 660, 96 *S.Ct.* 2333, 49 *L.Ed.*2d 124 (1976), Pennsylvania alleged that this State's Transportation Benefits Tax, *N.J.S.A.* 54:8A–58 *et seq.*,[6] was unconstitutional under the Privileges and Immunities Clause of Article IV and the Equal Protection Clause of the Fourteenth Amendment.[7] Finding no justiciable

---

[5]These interests were advanced by plaintiff Robert Coe at his deposition and not challenged by the State. Coe also claimed that he would "not have to file so many forms," but on cross-examination by the State admitted that he would still be required to file a New Jersey gross income tax return.

[6]The Transportation Benefits Tax operated in a manner similar to the ETT, covering only Pennsylvania residents deriving income from sources within New Jersey. The term "critical area state" was also used in this legislation, but the statute's operation was predicated upon the existence of a "*severe* transportation problem" rather than a "*critical* transportation problem." Compare *N.J.S.A.* 54:8A–61(a) with *id.* at 54:8A–5(a) (emphasis supplied). Subsequent legislation permitted reciprocal agreements with critical area states whereby individuals could be relieved of liability under the Transportation Benefits Tax or the ETT. *L.*1976, *c.* 126, § 1, *N.J.S.A.* 54A:8A–122. Such an agreement was concluded by New Jersey and Pennsylvania on December 20, 1976 and amended by the states on December 31, 1977. As a consequence, the Transportation Benefits Tax is no longer imposed on Pennsylvania residents earning income in New Jersey, and New Jersey residents earning income in Pennsylvania are no longer liable for Pennsylvania state income taxes.

[7]In a separate case decided by the Court in *Pennsylvania v. New Jersey*, Maine, Massachusetts and Vermont were denied leave to file original complaints against New Hampshire for an accounting of funds diverted from their treasuries as a result of credit given their residents for taxes paid under New Hampshire's unconstitutional commuter income tax. These states based their claims on the violation of the Privileges and Immunities Clause found by the Court in *Austin*. *Pennsylvania v. New Jersey*, 426 *U.S.* at 661–663, 96 *S.Ct.* at 2334–2335, 49 *L.Ed.*2d at 127–128.

controversy, the United States Supreme Court denied Pennsylvania's motion for leave to file an original complaint. The Court held that the only direct injury to the plaintiff states resulted from decisions by their legislatures to extend tax credit for income taxes paid by their residents to the defendant states. Without resolving Pennsylvania's claims that the Transportation Benefits Tax Act violated the Privileges and Immunities and Equal Protection Clauses, the Court responded:

> The short answer to these contentions is that both Clauses protect people, not States. [426 *U.S.* at 665, 96 *S.Ct.* at 2335, 49 *L.Ed.*2d at 129]

New York similarly attempted to challenge the ETT in an original action in the United States Supreme Court, *New York v. New Jersey*, 429 *U.S.* 810, 97 *S.Ct.* 48, 50 *L.Ed.*2d 70 (1976) but the Court denied its motion for leave to file an original complaint, citing *Pennsylvania v. New Jersey, supra*. New York, therefore, cannot be the real party in interest in this case; its role in financing the litigation is irrelevant to plaintiffs' standing to bring suit.

We conclude that as a matter of New Jersey law, the interests asserted by plaintiffs are personal to them and justiciable in the present suit.[8]

## III

### The Statutory Scheme

The enactment of the ETT in 1961, *L.*1961, *c.* 32, was preceded by extensive studies and hearings on the transportation prob-

---

[8]New Jersey argues that since the issues involve the relationships between New Jersey's and New York's tax laws and since the 1962 agreement constitutes an element of the State's defense, complete adjudication is impeded by New York's absence. This argument is misconceived. This Court may construe the agreement and determine its relevance without the presence of New York as a party. Joinder of New York is not required. See *R.* 4:28–1. In view of our holding regarding the constitutional significance of the Accord, see *infra* at 510–513, we need not consider whether it would have been desirable to invite New York to participate as a litigant.

lems facing the New Jersey-New York metropolitan area. See *Report of the Project Director of the Metropolitan Rapid Transit Commission* (1957) (hereafter *Metropolitan Transit Commission Survey*); *Public Hearings on Assembly Bills No. 16 & 115 and Senate Bill No. 50 before New Jersey Legislature Assembly Committee on Federal & Interstate Relations and Assembly Committee on Highways, Transportation & Public Utilities* (November 24 & December 3, 1958); *Joint Report of the New Jersey Legislature Assembly Committee on Highway, Transportation & Public Utilities and the Committee on Federal and Interstate Relations on A–16, A–115 and S–50* (1958); *Report on Rapid Transit for the New York-New Jersey Metropolitan Area* (1958) (hereafter *Metropolitan Rapid Transit Report*); N.J. State Highway Dep't., Div. of Railroad Transportation, *A Proposal Towards Solving New Jersey's Transportation Problem* (1959); N.J. Governor, 1954 (Meyner), *Memorandum—Proposed Commuter Benefit Tax* (May 2, 1960) (hereafter *Governor's Memorandum*); *Public Hearing before New Jersey Legislature Assembly Appropriations Committee on Assembly Bill No. 65, Emergency Transportation Tax Act* (May 20, 1960) (hereafter *Hearing on Assembly Bill No. 65*). These inquiries focused mainly on the impact of peak-hour transportation demands generated by interstate commuters.[9] See, *e. g., Governor's Memorandum, supra* at 1; *Hearing on Assembly Bill No. 65, supra* at 1, 8; *Metropolitan Rapid Transit Report, supra* at 14. Efforts to ease New Jersey's burden culminated in the passage of Chapter 32 of the Laws of 1961.[10] The statute authorized a

---

[9]The changing pattern of commutation—away from rail service towards the use of private automobiles—was another persistent theme in these studies and reports.

[10]Other proposed solutions—such as a bi-state rapid transit loop and the use of surplus New Jersey Turnpike collections to subsidize railroad passenger service—failed to muster sufficient support. See *Statement of Dwight R. G. Palmer, Commissioner, N.J. State Highway Department, before the New*

tax on the income derived by New Jersey residents from sources in another "critical area state" and on the income of residents of another "critical area state" derived from sources within this State. The statute defined "critical area state" to mean

> this State and such other State bordering thereon within which there exists part of an area, another part of which is in this State, and within which area there is, as of January 1 of any year, a critical transportation problem in respect to the transportation of persons and property interstate. [L.1961, c. 32, § 5(a), N.J.S.A. 54:8A-5(a)]

This authority would be invoked during any year in which the State Highway Commissioner certified the existence of a "critical transportation problem." L.1961, c. 32, § 5(c), N.J.S.A. 54:8A-5(c). Such a certification would entail a finding that

> there is such number of daily commuters between [the] States as to create a severe peak-load demand requiring facilities and services, by any means or mode of transportation far in excess of those needed for normal travel outside of usual commuter hours * * *. L.1961, c. 32, § 5(b), N.J.S.A. 54:8A-5(b)]

According to a legislative presumption,

> whenever the aggregate number of [interstate commuters] * * * exceeds 100,000, that fact reasonably indicates that a critical transportation problem exists. [Id.]

Pursuant to section 5(c) of the act, N.J.S.A. 54:8A–5(c), the State Highway Commissioner certified to the State Treasurer on June 27, 1961, that a critical transportation problem existed in

---

*Jersey Senate Committee Investigating the Financial Structure and Operations of the Port of New York Authority* at 4 (Jan. 26, 1961); *Hearing on Assembly Bill No. 65, supra* at 7 (Comments of Stephen Wiley, Counsel to the Governor); *Metropolitan Transit Commission Report, supra* at 57–66 (Appendix B); *Metropolitan Rapid Transit Survey, supra* at 23–34.

an area partly in New Jersey and partly in New York and that the states of New York and New Jersey were therefore "critical area states" within the meaning of section 5. *1961 Certification of the New Jersey State Highway Commissioner* (hereafter "1961 Certification") at 21.

As enacted, the ETT contained a credit provision which would have released New York residents from imposition of the tax by virtue of then existing New York law. The credit allowed out-of-state residents to deduct payments under their home state's income tax from their ETT liability if their home state granted a reciprocal privilege to New Jersey residents. See *L.*1961, *c.* 32, § 16, *N.J.S.A.* 54:8A–16(A). At the time the ETT act became law, New York permitted such a reciprocal tax credit. See 1960 *N.Y.Sess.Laws, Ch.* 563, *N.Y.Tax Law* § 640 (repealed). Because ETT and New York Personal Income Tax rates were identical, see *infra* at 498–499, the operation of both states' credit provisions would have allowed commuters from either state to avoid paying any income tax to the states where they worked. Thus when originally enacted, the ETT fell exclusively on New Jersey residents earning income in New York, the number of which was far greater than the number of New York residents earning income in New Jersey. See *1961 Certification, supra,* at 7. It is apparent from the hearings held before passage that New York's reciprocal credit had been taken into account in devising the emergency transportation tax. Indeed, the tax was described as having been anticipated by New York since its enactment in 1919 of an income tax with a reciprocal credit provision. See 1919 *N.Y.Sess.Laws, Ch.* 627, § 363. It was characterized as simply diverting New Jersey residents' money back to New Jersey.[11]

---

[11]See *Hearing on Assembly Bill No. 65, supra* at 11 (Remarks of Stephen Wiley, Counsel to the Governor: "We are not getting something which

New York's response to this potential loss of revenue was a prompt repeal of the credit it granted to non-residents taxed by their home states, and the amendment of its tax law to allow credit only to its own residents paying taxes to other jurisdictions. 1962 *N.Y.Sess.Laws*, Ch. 2, repealing *N.Y.Tax Law* § 640 and amending § 620.[12] This change in New York law prevented New Jersey commuters from deducting ETT payments from their New York income tax liability and had the effect of subjecting New York residents to the ETT. At the time, however, no credit provision existed which would have released New Jersey residents from their ETT liability. See *L.*1961, *c.* 32, § 16; *L.*1961, *c.* 129, § 9. As a result, New Jersey residents were liable for both New York Personal Income Tax and the ETT on income earned in New York, while New York residents were liable for only the ETT on income derived from sources in New Jersey.

Subsequent negotiations between officials of the two states resulted in a more balanced arrangement for taxing income earned in one state by residents of the other. On May 6, 1962, the Governors of New York and New Jersey issued a statement embodying the terms of this agreement. New York would allow its residents a credit against New York State personal income taxes for payments to New Jersey under the ETT, pursuant to

---

doesn't belong to us. We are not getting $40 million for nothing. We are simply 41 years late getting what we should have gotten all the way along.").

[12]Such a response by New York was not completely unexpected. Serious concern was expressed during deliberations on the ETT Act that its passage would prompt New York to effect double taxation of New Jersey commuters. However, it was thought "practically impossible or illegal" for New York to deny New Jersey residents an income tax credit. *Governor's Memorandum, supra* at 3–4. See *Public Hearing on Assembly Bill No. 65, supra* at 11–12 (Comments of Stephen Wiley, Counsel to the Governor), 25 (Comments of Mrs. Kenneth B. Smith, Vice-President of League of Women Voters of New Jersey).

the legislation enacted earlier in 1962. See 1962 *N.Y.Sess.Laws, Ch.* 2, *N.Y.Tax Law* § 620. The Governor of New Jersey would propose legislation granting credit to New Jersey residents against their ETT liability for income taxes paid to New York. Such legislation was passed on June 5, 1962, *L.*1962, *c.* 70, § 4, *N.J.S.A.* 54:8A–16(B). Both states' credits were given retroactive effect beginning January 1, 1961. *L.*1962, *c.* 70, § 13; 1962 *N.Y.Sess.Laws, Ch.* 2, § 7.

The 1962 amendment to the ETT act, *L.*1962, *c.* 70, provided that the Division of Taxation, Department of the Treasury, could by regulation relieve New Jersey residents of the obligation to file an ETT return "[i]f it shall appear to the satisfaction of the [D]ivision, based upon an opinion of the Attorney General," that the credit given for taxes paid to another critical area state would be "substantially sufficient to offset" the liability under the ETT. *L.*1962, *c.* 70, § 6, *N.J.S.A.* 54:8A–19(b). Later that year the Attorney General issued Formal Opinion No. 1 which expressed the view required by the amendment. *Atty. Gen.Op.No. 1 (1962).* The Division of Taxation accordingly issued a regulation excusing New Jersey residents from filing ETT returns. *N.J.Tax Reg.* No. 1963–1, *N.J.A.C.* 18:10–11.3.

The fact that New York income taxes offset ETT assessments was not fortuitous. As originally enacted and subsequently amended, rates under ETT have been set to equal those of the New York personal income tax. Compare *L.*1961, *c.* 32 with 1960 *N.Y.Sess.Laws, Ch.* 563; *L.*1972, *c.* 12, *N.J.S.A.* 54:8A–6.3 (tax surcharge) with 1972 *N.Y.Sess.Laws, Ch.* 1, *N.Y.Tax Law* § 601–B (tax surcharge); *L.*1978, *c.* 131, *N.J.S.A.* 54:8A–6, with 1977 *N.Y.Sess.Laws, Ch.* 70 & 1978 *N.Y.Sess.Laws, Ch.* 70, *N.Y.Tax Laws § 602.* Consequently New Jersey residents have never paid any emergency transportation taxes, although they have paid a monetary equivalent to New York under the New York Personal Income Tax. Conversely, since the New York-New Jersey metropolitan area is the only "critical area" ever

certified under the act, only New York residents have in fact paid the emergency transportation tax. They in turn have received credit exempting them from payment to New York of the New York Personal Income Tax. See, *e. g.*, *1961 Certification, supra,* at 20–21; *1970 Certification of the Commissioner of Transportation* at 20–21; *1977 Certification of the Commissioner of Transportation* at 11–12.

The tax is imposed on income "derived from sources within" New Jersey, defined to include

such income and gain from all property owned [13] and from salaries, wages, or compensation for personal services of whatever kind and in whatever form paid, and from all business, trade, profession or occupation carried on, in [New Jersey]. [*N.J.S.A.* 54:8A–4 (footnote added)]

Under *N.J.S.A.* 54:8A–20, all ETT receipts are allocated to a special "Transportation Fund." They may be used only for the financing of projects and programs designed to alleviate transportation problems between New Jersey and the other critical area state—New York. Disbursements are to be "screened" to insure proper use of ETT money. *N.J.S.A.* 54:8A–20(b). Misapplication of the Transportation Fund automatically entitles each contributor to a refund equalling his pro rata share of the monies illegally disbursed. *N.J.S.A.* 54:8A–22.

After July 1, 1976, the scheme of taxation in New Jersey was profoundly altered. With the passage of the Gross Income Tax Act, *N.J.S.A.* 54A:1–1 *et seq.*, New Jersey residents and all non-residents earning income in New Jersey [14] became subject to

---

[13]By this provision, non-commuting New Yorkers are also subject to this tax. Plaintiffs have not alleged that they pay ETT on income other than wages or salaries earned in New Jersey.

[14]Only that portion of a non-resident's income derived from sources within New Jersey is subject to the Gross Income Tax. *N.J.S.A.* 54A:5–5; see *N.J.S.A.* 54A:5–6 to 54A:5–8. The same is true regarding the ETT. N.J.S.A. 54:8A–2(b); see *N.J.S.A.* 54:8A–4, 54:8A–33(a).

a levy of 2% on taxable income up to $20,000 and 2.5% on the excess taxable income over $20,000. *N.J.S.A.* 54A:2–1. Individuals now subject to both the New Jersey Gross Income Tax and the ETT are liable for a sum equal to the greater of the two taxes. *N.J.S.A.* 54:8A–119.[15] Under the present scheme, the ETT amount due will always be greater since the ETT rates are pegged to the New York personal income tax rate. Compare *N.J.S.A.* 54:8A–6 (ETT rates from 2% to 15%) with *N.J.S.A.* 54A:2–1 (Gross income tax rates from 2% to 2½%). However, the full amount of tax collected using ETT rates no longer goes into the Transportation Fund. The amount that would be due by imposition of the Gross Income Tax is deposited in the Property Tax Relief Fund, as are all Gross Income Tax receipts. *N.J.S.A.* 54:8A–121; *N.J.S.A.* 54A:9–25; see *N.J.Const.*, Art. VIII, § 1, par. 7. Only the excess, which results from application of the higher ETT rates, is allocated to the Transportation Fund. *N.J.S.A.* 54:8A–120.

As originally enacted, the ETT was to expire on December 31, 1970. *L.*1961, *c.* 32, § 57. However, the Legislature extended its life to December 31, 1980. *L.*1969, *c.* 36, *N.J.S.A.* 54:8A–57. Every year since 1962, the Commissioner of Transportation has certified that a "critical transportation problem" exists in the New York-New Jersey area, and the tax has been collected.

## IV

### *The Privileges & Immunities Clause*

Stressing the importance of the traditional presumption in favor of a statute's constitutionality, the trial court concluded

---

[15]The Income Tax Act originally repealed the ETT. *L.*1976, *c.* 47, *N.J.S.A.* 54A:9–22. However, this repeal was rescinded before its effective date by *L.*1976, *c.* 65, § 1.

that the ETT "embodies a rational and equitable allocation of the burdens of state government." Although the court correctly recited the rule of "substantial equality" that governs analysis under the Privileges and Immunities Clause, see *U.S.Const.*, Art. IV, § 2; *Austin v. New Hampshire, supra,* we conclude that it failed to apply the principle properly to the facts of this case. The court also erred in upholding New Jersey's taxing scheme on the basis of an executive agreement between New York and New Jersey regarding the taxation of each other's residents.

## A

### The Standard of "Substantial Equality"

Article IV, § 2, cl. 1 of the United States Constitution provides:

The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.[16]

Although the text does not define the privileges and immunities of national citizenship, it is clear that an interest at stake in this case—the pursuit of one's livelihood free from economic discrimination—is protected by the clause. In its most recent expression of the scope of the Privileges and Immunities Clause, the United States Supreme Court unanimously held that the pursuit of an occupation outside one's home state is a constitutionally protected right. See *Hicklin v. Orbeck,* 437 *U.S.* 518, 524–525, 98 *S.Ct.* 2482, 2487–2488, 57 *L.Ed.2d* 397, at 404 (1978). This principle is well-settled.

---

16As the Supreme Court noted in *Austin,* "[f]or purposes of analyzing a taxing scheme under the Privileges and Immunities Clause the terms 'citizen' and 'resident' are essentially interchangeable." 420 *U.S.* at 662 n.8, 95 *S.Ct.* at 1195, n.8, 43 *L.Ed.2d* at 536 n.8. See *Travis v. Yale & Towne Mfg. Co.,* 252 *U.S.* 60, 78–79, 40 S.Ct. 228, 231, 232, 64 *L.Ed.* 460, 469 (1920).

> [I]t was long ago decided that one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State. [*Toomer v. Witsell*, 334 *U.S.* 385, 396, 68 *S.Ct.* 1156, 1162, 92 *L.Ed.* 1460, 1471 (1948) (footnote omitted)]

See *Travis v. Yale & Towne Mfg. Co.*, 252 *U.S.* 60, 40 *S.Ct.* 228, 64 *L.Ed.* 460 (1920); *Ward v. Maryland*, 79 *U.S.* (12 *Wall.*) 418, 20 *L.Ed.* 449 (1871). The method by which New Jersey allegedly discriminates against non-residents involves another aspect of the privileges and immunities of national citizenship—" 'an exemption from higher taxes or impositions than are paid by the other citizens of the state.' " *Austin v. New Hampshire*, 420 *U.S.* at 661, 95 *S.Ct.* at 1195, 43 *L.Ed.*2d at 535 (quoting *Corfield v. Coryell*, 6 *F.Cas.* 546, 552 (C.C.E.D.Pa.1825) (No. 3, 230)); see *Ward v. Maryland, supra.*

Although legislatures "possess the greatest freedom in classification" in the area of taxation, *Madden v. Kentucky*, 309 *U.S.* 83, 88, 60 *S.Ct.* 406, 408, 84 *L.Ed.* 590, 593 (1940), when a violation of the Privileges and Immunities Clause is alleged, the standard of judicial review must be "substantially more rigorous" than a search for rationality in order to "protect [that] constitutional value from erosion." *Austin v. New Hampshire*, 420 *U.S.* at 662–663, 95 *S.Ct.* at 1195–1196, 43 *L.Ed.*2d at 535–536. Absolute equality is not required, however. Inexactitude is permissible when a state fairly attempts to distribute the burdens and costs of government to those receiving its benefits:

> It is enough that the state has secured a reasonably fair distribution of burdens, and that no intentional discrimination has been made against nonresidents. [*Travelers' Ins. Co. v. Connecticut*, 185 *U.S.* 364, 371, 22 *S.Ct.* 673, 676, 46 *L.Ed.* 949, 954 (1902)]

As announced by the Supreme Court in *Austin*, the rule that has developed is one of "substantial equality of treatment." 420 *U.S.* at 665, 95 *S.Ct.* at 1198, 43 *L.Ed.*2d at 537.

 While invoking close scrutiny, disparity of treatment does not violate this rule if it has a valid justification independent of mere citizenship.

Thus the inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them. The inquiry must also, of course, be conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures. [*Toomer v. Witsell,* 334 *U.S.* at 396, 68 *S.Ct.* at 1162, 92 L.Ed. at 1471 (footnote omitted)]

See *Hicklin v. Orbeck, supra.* A state may therefore impose upon non-residents the additional expenses occasioned by their activities within the state, or the reasonable costs of benefits which they receive from the state. See *Mullaney v. Anderson,* 342 *U.S.* 415, 417, 72 *S.Ct.* 428, 430, 96 *L.Ed.* 458, 461–462 (1952); *Toomer v. Witsell,* 334 *U.S.* at 398–399, 68 *S.Ct.* at 1163–1164, 92 *L.Ed.* at 1472–1473; *Travelers' Ins. Co. v. Connecticut,* 185 *U.S.* at 368–369, 22 *S.Ct.* at 674–675, 46 *L.Ed.* at 953. See also *Baldwin v. Montana Fish and Game Comm'n,* 436 *U.S.* 371, 402–406, 98 *S.Ct.* 1852, 1869–1872, 56 *L.Ed.*2d 354, 377–380 (Brennan, J., dissenting); *Davis v. Franchise Tax Bd.,* 71 *Cal. App.*3d 998, 139 *Cal.Rptr.* 797 (Ct.App.1977).

 Although the trial court correctly described the criteria for justifying disparate treatment of non-residents, it did not properly apply them. As the Supreme Court stated in *Toomer* and reiterated in *Hicklin,* "a 'substantial reason for the discrimination' would not exist * * * 'unless there is something to indicate that non-citizens constitute a *peculiar source* of the evil at which the statute is aimed.'" *Hicklin v. Orbeck,* 437 *U.S.* at 525–526, 57 *L.Ed.*2d at 404 (quoting *Toomer v. Witsell,* 334 U.S. at 398, 68 *S.Ct.* at 1163, 98 *S.Ct.* at 2488, 92 *L.Ed.* at 1460). Contrary to the trial court's ruling, the burden of demonstrating that non-residents are the "peculiar source" clearly lies with the State. *Hicklin v. Orbeck,* 437 *U.S.* at 526, 98 *S.Ct.* at 2488, 57

*L.Ed.*2d at 405. Once that is proven, the court must then determine whether that discrimination bears a "substantial relationship to the particular 'evil' [that the non-residents] are said to present." *Id.* at 527, 98 *S.Ct.* at 2489, 57 *L.Ed.*2d at 405.

██ Applying this two-fold analysis to the facts before us, we reject plaintiffs' claim that as a matter of law, a transportation problem cannot serve to justify a commuter tax on non-residents. Plaintiffs argue that the *Austin* Court rejected such a rationale when it invalidated New Hampshire's commuter income tax on non-residents.[17] In that case, however, New Hampshire did not claim that commuters contributed in any way to a local transportation emergency, nor did that state even allege the existence of such an emergency. The only purpose served by New Hampshire's tax was that of diverting revenue into its general fund. See 420 *U.S.* at 666, 95 *S.Ct.* at 1197, 43 *L.Ed.*2d at 538.

Were the sole purpose of New Jersey's ETT simply that of diverting revenue for general state purposes, we would similarly conclude that the tax violates the Privileges and Immunities Clause. However, we agree with the State that a transportation problem can serve as a valid independent justification for a discriminatory tax.[18] Unlike the situation in *Austin*, plaintiffs

---

[17]The mechanics of the ETT are strikingly similar to the invalidated New Hampshire tax. That state taxed non-residents at the rate they would have been taxed by their home states. Because of credits granted by their home states, their total yearly tax liability, like that of New York residents subject to the ETT, remained unchanged.

[18]Plaintiffs also allege that the transportation justification advanced by the State is a "sham," pointing to the fact that the ETT rate structure has consistently been amended to conform to New York's personal income tax, and never in response to any determined change in New Jersey's transportation needs. However, if the practical effect of the tax can be shown to comport with the rule of "substantial equality," the source of the rates employed becomes irrelevant.

here challenge a specific statutory scheme calling for a transportation tax designed to fund only transportation-related expenditures.

While the possibility of a "valid independent reason" exists, we are unable to conclude on the present record that the State has sustained its burden. Acting Transportation Commissioner Mullen testified during his deposition that the problem creating the "transportation emergency" is peak-load commuter demand. Other evidence, however, shows that New York to New Jersey commuters are far outnumbered by New Jersey residents commuting to New York. See Affidavit of Russell H. Mullen, Acting Commissioner of Transportation at 4; see also Tri-State Regional Planning Commission, *1970 Census Worker File* (1975); *1977 Certification of Commissioner of Transportation* at 9; *1970 Certification of Commissioner of Transportation* at 11. While commuters living in New York need not be the sole cause of New Jersey's transportation crisis to justify discriminatory treatment,[19] more than merely their identification is required. The State's burden of showing that non-residents constitute a "peculiar source" of an evil would be stripped of meaning if that obligation could be discharged simply by referring to a problem to which non-residents make but a small contribution. Imposition of the ETT cannot be justified if it appears that the tax burden on New York residents is substantially disproportionate to their burden upon New Jersey's transportation facilities.

This is not to say that non-resident commuters cannot be charged for any benefits resulting from New Jersey's subsidization of commuter transportation facilities and expenditures for highway construction and maintenance in northern New Jersey. The Constitution does not entitle nonresident commut-

---

[19]See *Hicklin v. Orbeck,* 437 *U.S.* at 526, 98 *S.Ct.* at 2488, 57 *L.Ed.2d* at 404, where the Court refers to non-residents "caus[ing] *or exacerbat[ing]* the problem the State seeks to remedy * * *." (Emphasis supplied).

ers to a "free ride." The State may exact from them a fair share of the cost of adequate transportation facilities without violating the Privileges and Immunities Clause.

The record discloses that expenditures for highway construction and maintenance in northern New Jersey amounted to $910 million during the years 1970 through 1977. Since none of these funds came from emergency transportation taxes,[20] non-residents apparently did not contribute to the cost of providing these vital transportation facilities.[21] The expenditure figures introduced also indicate, however, that ETT funds have supplied a very substantial portion of state expenditures for bus and rail facilities. While non-resident use of such facilities constitutes a very small percentage of total patronage,[22] we recognize that a strict percentage analysis is not required for each separate type of commuter transportation facility. Under the constitutional mandate of "substantial equality," it is only necessary that total payments of the ETT by non-resident commuters be substantially proportionate to the total benefit they derive by virtue of State expenditures for all types of commuter facilities. Stated differently, the ETT would be justified if its burden on New York commuters is substantially commensurate with the benefit they derive from their use of New Jersey's transportation facilities.

---

[20]See Affidavit of Richard B. Standiford. Since 1976, ETT funds have been held in reserve pending the outcome of this litigation. However, pursuant to L.1977, c. 138, ETT funds have been called into use for certain highway projects.

[21]It is necessary to ascertain on the basis of a full record whether commuters have provided funds for highway purposes in any other manner during the entire life of the ETT. Presently the record contains data for only an eight-year period.

[22]For example, in the fiscal years 1970 to 1977, ETT funds accounted for approximately 75% of railroad subsidies and approximately 20% of the bus operator subsidies, but New York to New Jersey commuters comprised less than 3% of the ridership.

The State also emphasizes that New Jersey residents pay other taxes—such as property taxes and sales and use taxes—which non-residents either do not pay or pay substantially less. This assertion has sparked a sharp dispute between the parties as to what tax liabilities can be compared in assessing whether non-residents are in fact being required to pay more than their fair share. Plaintiffs allege that *Austin* made clear that only taxes to which non-residents are not subject can be compared with a discriminatory impost. See *Austin v. New Hampshire*, 420 *U.S.* at 659 n. 3, 662 n. 8, 95 *S.Ct.* at 1194 n. 3, 1195 n. 8, 43 *L.Ed.*2d at 534 n. 3, 536 n. 8. Noting that property taxes are paid by any non-resident who owns property in New Jersey, plaintiffs argue that such taxes do not qualify as "taxes imposed upon residents alone" under *Austin*. See 420 *U.S.* at 665, 95 *S.Ct.* at 1197, 43 *L.Ed.*2d at 538.

We do not agree that taxes which non-residents may pay must be excluded from the "substantial equality of treatment" analysis. While " 'something more is required than bald assertion' * * * to establish the validity of a taxing statute that on its face discriminates against nonresidents," *Austin*, 420 *U.S.* at 665, n. 10, 95 *S.Ct.* at 1197 n. 10, 43 *L.Ed.*2d at 538 n. 10 (quoting *Mullaney v. Anderson*, 342 *U.S.* at 418, 72 *S.Ct.* at 430, 96 *L.Ed.* at 462), the question is still one of impact in fact. The State has introduced evidence lending support to the conclusion that residents pay a much greater percentage of New Jersey's property and sales taxes than non-residents. The discriminatory impact of the ETT cannot be offset, however, by the fact that residents pay more total tax dollars than non-residents. Even a *per capita* comparison is inappropriate unless its scope is restricted to collections for transportation services, the asserted ground of justification for the ETT. To sustain the tax, there must be a showing that the impact of ETT on non-residents, along with their other contributions for public transportation

expenses, is substantially offset by the benefits they receive from transportation services.

The State introduced the affidavit of John F. Laezza, Director of the Division of Local Government Services, Department of Community Affairs, in which he asserts that "[i]n 1975 the municipalities and county governments in the ten northern counties spent approximately $12,645,000 for services directly allocable to commuters from New York." This figure allegedly represents the non-resident commuters' pro rata share of the total public safety and public works expenditure made by the ten counties and their municipalities. As explained by Director Laezza, this strict percentage computation was based on the theory that a person who commutes to and works in New Jersey for a part of the day utilizes these facilities to the same extent as a New Jersey resident.[23] This assumption is questionable; moreover, it is only to the extent these benefits arise from local maintenance of transportation facilities that they should be included in the constitutional analysis.

We reject the State's argument that since the effect of the challenged tax is in fact no more onerous than the liability taxpayers would otherwise incur to New York, it does not violate the privileges and immunities of non-residents. As the Supreme Court noted in *Austin*, while such an argument may have "initial appeal, it cannot be squared with the underlying policy of comity to which the Privileges and Immunities Clause commits us." 420 *U.S.* at 666, 95 *S.Ct.* at 1197, 43 *L.Ed.*2d at 538.

The evidence here presented falls far short of showing that the non-residents are taxed only to the extent of their contribu-

---

[23]Director Laezza testified at his deposition that he computed this figure by calculating the number of New York to New Jersey commuters as a percentage of the total population of the ten northern counties (including these commuters) and then allocating to the non-resident commuters that percentage of the total expenditures for public safety and public works in the ten counties.

tion to the transportation problem. We are therefore unable to apply the correct constitutional standard of "substantial equality" to the record before us. A remand is accordingly necessary to permit a full exploration of the benefits and burdens to non-resident commuters occasioned by State transportation programs and imposition of the ETT. In view of our disposition of this case, we now set out guidelines for further trial proceedings.

On remand, evidence should be introduced to enable the trial court to compare the transportation benefits New York residents receive and the tax contributions they are required to make. The data must therefore include statistics on annual state and local expenditures—identified by source—for commuter rail and bus services and for construction and maintenance of highways used by interstate commuters. Figures on the amount and application of ETT monies must also be presented.[24] Commutation figures must be introduced for the years during which non-residents paid emergency transportation taxes. The total number of New Jersey to New York commuters and the proportion by which they exceed New York to New Jersey commuters would be a relevant consideration. Travel figures must also take into account the substantial amount of intrastate use of all facilities funded.

Only when the State supplies such an accounting can the relationship between benefits and burdens be properly assessed. Once these computations are submitted, the court can then make a fully informed judgment on whether the problems of peak-hour commutation by New York residents justifies imposition of the ETT.

---

[24]The evidence thus far presented covers only the years 1970–1977. The entire effect of the ETT should be determined from a full record of its operation. Inequality in any single year may not be indicative of overall inequality. "Oversubsidization" in one area may be offset by "undersubsidization" in another.

B

*The 1962 "Accord"*

The parties disagree over the existence and legal effect to be given the alleged "accord," "agreement" or "arrangement" entered into by New York and New Jersey in 1962. See *supra* at 497–498.

Plaintiffs argue that no such agreement ever existed and that the alleged accord was nothing more than a joint press release by the two governors. They note that the only "agreement" in the record relates solely to procedures for tax withholding. Defendant contends that the states of New York and New Jersey had entered into a "reciprocal arrangement" to apportion equitably the financial burdens of government among citizens who live in one state and earn income in the other. Since this arrangement insured that commuters from New York would suffer no "additional overall tax burden," the State maintains that the scheme is not repugnant to the Privileges and Immunities Clause. The trial court agreed, noting that

It boggles the mind to consider a situation where two states could not make adjustments between them and pass reciprocal-type legislation (which would allow either to pass tax laws) whereby the citizens of two states were not financially affected.

The trial court erred in its assessment of the effect of such interstate agreement. We need not decide, therefore, whether the existence of an enforceable interstate agreement would save the present scheme from invalidity. Even assuming, as the State claims, that New York could restrict its prerogative for fashioning tax policy by agreement with New Jersey, it is clear that New York has not done so here.

In the recent case of *United States Steel Corp. v. Multistate Tax Commission,* 434 *U.S.* 452, 98 *S.Ct.* 799, 54 *L.Ed.*2d 682 (1978), the United States Supreme Court addressed claims that the Multistate Tax Compact entered into by seven states creating a Multistate Tax Commission violated the Compact Clause of

the Federal Constitution, *U.S.Const.*, Art. I, § 10, cl. 3,[25] since no congressional approval had been given. The Court held that no violation had occurred since no state had relinquished any of its sovereign power in entering the compact. Under Article VII of the compact, the Multistate Tax Commission was given the power to adopt advisory regulations which would have "no force in any member State until adopted by that State in accordance with its own law." 434 *U.S.* at 457, 98 *S.Ct.* at 804, 54 *L.Ed.*2d at 692. If any State chose to adopt the proposed regulations, it could request the Commission to perform an audit. The Commission could seek compulsory process in aid of its auditing power in the courts of any state that had specifically adopted Article VIII of the compact by statute. Individual states retained "*complete control over all legislation and administrative action* affecting the rate of tax, the composition of the tax base (including the determination of the components of taxable income), and the means and methods of determining tax liability and collecting any taxes determined to be due." 434 *U.S.* at 457, ·98 *S.Ct.* at 805, 54 *L.Ed.*2d at 692 (emphasis supplied).

After an exhaustive survey of the history of the Compact Clause, the Court rejected a literal interpretation which

would require the States to obtain congressional approval before entering into any agreement among themselves, irrespective of form, subject, duration, or interest to the United States. [434 *U.S.* at 459, 98 *S.Ct.* at 806, 54 *L.Ed.*2d at 694]

Instead, the Court reaffirmed the view that the

"application of the Compact Clause is limited to agreements that are 'directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States.'" [434 *U.S.* at 471, 98 *S.Ct.* at 812, 54 *L.Ed.*2d at 701 (quoting

---

[25]"No State shall, *without the Consent of Congress*, * * * enter into any Agreement or Compact with another State * * *."

*New Hampshire v. Maine*, 426 *U.S.* 363, 369, 96 *S.Ct.* 2113, 2117, 48 *L.Ed.*2d 701 (1976) and *Virginia v. Tennessee*, 148 *U.S.* 503, 519, 13 *S.Ct.* 728, 734, 37 *L.Ed.* 537, 543 (1893)]

Under that rule, the Multistate Tax Compact was held not to require congressional approval:

[T]he test is whether the Compact enhances state power quo ad the National Government. This pact does not purport to authorize the member States to exercise any powers they could not exercise in its absence. Nor is there any delegation of sovereign power to the Commission: each State retains complete freedom to adopt or reject the rules and regulations of the Commission. Moreover, as noted above each State is free to withdraw at any time. [434 *U.S.* at 473, 98 *S.Ct.* at 812–813, 54 *L.Ed.*2d at 702]

 Following this analysis it is clear that if the 1962 Accord were interpreted to bind New York's power over the extension of tax credit to its residents, it would involve an impermissible relinquishment of that state's sovereign power. New Jersey would then be able to dictate portions of New York's taxation policy by enforcing the terms of the Accord. Under the rule of *United States Steel Corp. v. Multistate Tax Commission*, such an agreement requires congressional approval. Since no such approval was given, the Accord cannot be relied on by the State here as an enforceable agreement. The credit granted by New York is a matter of legislative grace upon which New Jersey may not rely to support the constitutionality of the ETT:

[T]he constitutionality of one State's statutes affecting nonresidents [cannot] depend upon the present configuration of the statutes of another State. [*Austin v. New Hampshire*, 420 *U.S.* at 668, 95 *S.Ct.* at 1198, 43 *L.Ed.*2d at 539]

Since the present interaction of the ETT with New York's personal income tax law is susceptible to change at any time by the legislature of either state, the ETT must independently pass muster under the Privileges and Immunities Clause.

The parties also disagree over the effect of a footnote in the *Austin* opinion regarding interstate cooperation in tax matters. The footnote reads:

> Neither *Travis* nor the present case should be taken in any way to denigrate the value of reciprocity in such matters. The evil at which they are aimed is the unilateral imposition of a disadvantage upon nonresidents, not reciprocally favorable treatment of nonresidents by States that coordinate their tax laws. [420 *U.S.* at 667 n.12, 95 *S.Ct.* at 1198 n.12, 43 *L.Ed.2d* at 539 n.12]

In light of *Austin*'s explicit statement that the constitutionality of a state's laws cannot depend upon the laws of a sister state, any reference to such interstate cooperation cannot be read to mean that the laws of an individual state need not withstand independent scrutiny under the Privileges and Immunities Clause. Reciprocally favorable treatment of non-residents does not violate the Privileges and Immunities Clause; New Jersey's unfavorable treatment of New York residents may. Resolution of this issue must await a full record.

## V

### *Equal Protection*

Plaintiffs allege that the ETT violates the Equal Protection Clause of the Fourteenth Amendment by placing an impermissible burden on their right to travel. They claim that since this right is "fundamental" the State must show that the ETT serves some "compelling state interest."

The constitutional right to travel interstate, as interpreted by the United States Supreme Court, is not implicated in this case. This right does not encompass mere movement. See *Memorial Hospital v. Maricopa County*, 415 *U.S.* 250, 255, 94 *S.Ct.* 1076, 1080, 39 *L.Ed.2d* 306, 313 (1974). It concerns interstate migration—the right "to migrate, resettle, find a new job, and start a new life." *Shapiro v. Thompson*, 394 *U.S.* 618, 629,

89 *S.Ct.*, 1322, 1328, 22 *L.Ed.2d* 600, 612 (1969). For the State to be required to show a compelling interest, the classification must penalize the exercise of the right of migration. *Memorial Hospital v. Maricopa County*, 415 *U.S.* at 258, 94 *S.Ct.*, at 1082, 39 *L.Ed.2d* at 315; *Dunn v. Blumstein*, 405, *U.S.* 330, 92 *S.Ct.* at 995, 31 *L.Ed.2d* 274 (1972); *Shapiro v. Thompson*, 394 *U.S.* at 634, 638 n.21, 89 *S.Ct.* at 1331, 1333 n.21, 22 *L.Ed.2d* at 615, 617 n.21.

 Since migration is not involved in this case, plaintiffs' attempt to clothe the right to travel protected by the Privileges and Immunities Clause as a "fundamental interest" under the Equal Protection Clause is misconceived. Plaintiffs do argue that the residency classification embodied in the ETT deters "migration" from New Jersey to New York. However, it is clear that these New York residents lack standing to assert the equal protection claims of New Jersey residents. See *Craig v. Boren*, 429 *U.S.* 190, 193–195, 97 *S.Ct.* 451, 454–456, 50 *L.Ed.2d* 397, 404–405 (1976); *Warth v. Seldin*, 422 *U.S.* 490, 95 *S.Ct.* 2197, 45 *L.Ed.2d* 343 (1975); *Broadrick v. Oklahoma*, 413 *U.S.* 601, 93 *S.Ct.* 2908, 37 *L.Ed.2d* 830 (1973); *United States v. Raines*, 362 *U.S.* 17, 80 *S.Ct.* 519, 4 *L.Ed.2d* 524 (1960).

 We also reject plaintiffs' attempt to characterize non-residents as a "suspect class." No decisional law supports such an interpretation. *Austin* is cited for the proposition that non-residents are not represented in New Jersey's Legislature—one characteristic of a suspect class. In that case, however, it was unnecessary to address the non-resident plaintiffs' equal protection claims in light of its disposition of the privileges and immunities issue. 420 *U.S.* at 668, 95 *S.Ct.* at 1198, 43 *L.Ed.2d* at 539. Similarly, in *Hicklin* and *Mullaney*, the Court did not reach the equal protection claims once a violation of the Privileges and Immunities Clause was found. *Hicklin*, 437 *U.S.* at 534 n.19, 98 *S.Ct.* at 2492 n.19, 57 *L.Ed.2d* at 410 n.19; *Mullaney v. Anderson, supra*. In *Baldwin v. Montana Fish and Game Comm'n*, 436 *U.S.* 371, 98 *S.Ct.* 1852, 56 *L.Ed.2d* 354 (1978), the

Court held that a legislative classification based on residency need only be rational to be valid under the Equal Protection Clause. See 436 *U.S.* at 389, 390, 98 *S.Ct.* at 1863, 56 *L.Ed.*2d at 369. We therefore conclude that non-residents are not a suspect class and that application of the strict scrutiny standard under the Equal Protection Clause is not required.

Since no fundamental interest or suspect class is here involved, the trial court was correct in assessing the ETT under the "rational relation" standard. See *San Antonio Ind. Sch. Dist. v. Rodriquez,* 411 *U.S.* 1, 93 *S.Ct.* 1278, 36 *L.Ed.*2d 16 (1973); *McGowan v. Maryland,* 366 *U.S.* 420, 81 *S.Ct.* 1101, 6 *L.Ed.*2d 393 (1961); *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp.,* 80 *N.J.* 6, 39–40, 364 *A.*2d 1016, 1034–1035 (1976), app.dism. and *cert.* den. *sub nom. Feldman v. Weymouth Tp.,* 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.*2d 373 (1977).

In determining whether the classification employed by the State bears a rational relation to a legitimate governmental purpose, it is important to remember that states have been accorded great latitude in the field of taxation:

> Traditionally classification has been a device for fitting tax programs to local needs and usages in order to achieve an equitable distribution of the tax burden. It has, because of this, been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. [*Madden v. Kentucky,* 309 *U.S.* 83, 88, 60 *S.Ct.* 406, 408, 84 *L.Ed.* 590, 593 (1940) (footnotes omitted)]

See *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 *U.S.* 356, 93 *S.Ct.* 1001, 35 *L.Ed.*2d 351 (1973); see also *McKenney v. Bryne,* 82 *N.J.* 304 (1980). There is no question that the alleviation of a "transportation emergency" is a legitimate governmental purpose. The remaining issue is whether there is any reasonably conceivable state of facts which would afford a rational basis for imposing the ETT only on the class consisting of New York

residents earning income in New Jersey. We conclude that there is. New York residents who commute to New Jersey contribute significantly to the excessive demands placed on New Jersey's transportation facilities in the New York-New Jersey area. It is certainly conceivable that New Jersey residents are called upon to pay their fair share of transportation costs by the operation of other state and local taxes. Mathematical equality of impact is not required. *Dandridge v. Williams,* 397 *U.S.* 471, 485, 90 *S.Ct.* 1153, 1161, 25 *L.Ed.*2d 491, 501–502 (1970).[26] Again, the nature of the field of taxation requires judicial tolerance of imperfections in legislative schemes:

> In such a complex arena in which no perfect alternatives exist, the Court does well not to impose too rigorous a standard of scrutiny lest all local fiscal schemes become subjects of criticism under the Equal Protection Clause. [*San Antonio Ind. Sch. Dist. v. Rodriquez,* 411 *U.S.* at 41, 93 *S.Ct.* at 1301, 36 *L.Ed.*2d at 48 (footnote omitted)]

Plaintiffs have not met their burden of demonstrating that the classification lacks any rational basis. *Madden v. Kentucky,* 309 *U.S.* at 88, 60 *S.Ct.* at 408, 84 *L.Ed.* at 593; *Taxpayers Ass'n of Weymouth Tp.,* 80 *N.J.* at 40. We therefore affirm the ruling of the trial court upholding the ETT under the Equal Protection Clause.

## VI

### *Disposition*

We conclude that a ruling on the constitutionality of the ETT cannot be made on the present record. As noted above, the trial court failed to apply the proper analysis under the Privileges and Immunities Clause. By drawing the issue too narrowly— "whether or not the *Austin* case is dispositive of the [ETT]

---

[26]Thus, the fact that there may be some non-commuting New York residents who must pay the ETT does not necessarily invalidate the classification under the Equal Protection Clause.

legislation"—the court could not resolve the factual issue of whether non-residents have been overcharged.[27] The complexity of this determination and the far-reaching effects of a decision on the issue of the statute's constitutionality make this case inappropriate for the summary disposition requested by the parties. See *R.* 4:67. A full record should therefore be developed. *Cf. Jackson v. Muhlenberg Hospital,* 53 *N.J.* 138, 142 (1969) (a "maximum of caution" is necessary when a ruling would "reach far beyond the particular case."); *Swiss Village Assocs. v. Mun. Council of Wayne Tp.,* 162 *N.J.Super.* 138, 142 (App.Div.1978); *Lusardi v. Curtis Point Prop. Owners Ass'n,* 138 *N.J.Super.* 44, 51 (App.Div.1975); *Bennett v. T & F Distrib. Co.,* 117 *N.J.Super.* 439, 445–446 (App.Div.1971), certif. den., 60 *N.J.* 350 (1972).

We therefore remand the matter to the trial court for proceedings consistent with this opinion. The court should follow the legal analysis outlined above, which requires the State to produce evidence enabling the court to determine whether the tax imposed on non-residents charges them only for their share of the transportation problem they cause or the benefits they receive. While mathematical certainty is not required, see *Travelers' Ins. Co. v. Connecticut,* 185 *U.S.* at 371–372, 22 *S.Ct.* at 675–676, 64 *L.Ed.* at 954, the present record does not support a conclusion that the discrimination practiced against non-residents bears the requisite "close relation" to the "transportation emergency" advanced as its justification. See *Toomer v. Witsell,* 334 *U.S.* at 396, 68 *S.Ct.* at 1162, 92 *L.Ed.* at 1471.

The judgment of the Superior Court, Chancery Division, is vacated insofar as it declares the Emergency Transportation

---

[27]We agree with the trial court, however, that the act itself contains the necessary safeguards for ensuring application of funds collected to transportation facilities serving commuters. We therefore do not determine whether there has been any misapplication of funds as the statute has been applied.

Tax Act constitutional under the Privileges and Immunities Clause. The matter is remanded for a plenary hearing consistent with this opinion.

*For vacation and remandment*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER—5.

*For affirmance*—None.