.Howard U. TAYLOR, Margaret T. Taylor, Wayne Thomas Feyereinsen, Frances C. Feyereisen, James W. Mc-Carville, Karen Beth McCarville, Michael E. Fairfield and Donna J. Fairfield, Plaintiff-Appllants,

v.

Dennis J. CONTA, individually and as former Secretary of the Wisconsin Department of Revenue, and Mark E. Musolf, individually and as Secretary of the Wisconsin Department of Revenue, Defendants-Respondents.

Supreme Court

*No. 80–2221. Argued January 5, 1982.—Decided March 2, 1982.*

(Also reported in 316 N.W.2d 814.)

322

For the plaintiffs-appellants there was a brief by *Theodore C. Widder, III* and *Schlotthauer, Johnson, Mohs, MacDonald & Widder* of Madison, and oral argument by *Theodore C. Widder, III.*

For the defendants-respondents the cause was argued by *John J. Glinski,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

SHIRLEY S. ABRAHAMSON, J.   The question presented on appeal is whether secs. 71.05 (1) (a) 5 and 71.05 (1) (a) 7, Stats. 1975, two provisions of the Wisconsin income tax law, contravene the privileges and immunities clause of the federal constitution. We affirm the judgment of the circuit court for Dane county, William D. Byrne, Circuit Judge, which declared the statutes constitutional and dismissed the action.

## I.

The facts are not in dispute. In 1976 the eight taxpayers (four married couples), Mr. and Mrs. Howard Taylor, Mr. and Mrs. Wayne Feyereisen, Mr. and Mrs. James McCarville, and Mr. and Mrs. Michael Fairfield,

sold their respective Wisconsin residences, purchased new residences outside Wisconsin and moved from the state in connection with each of the husbands' employment. Each taxpayer realized a gain on the sale of a principal residence located in Wisconsin but qualified for non-recognition of the gain under sec. 1034 of the Internal Revenue Code by purchasing and using a new residence.[1]

Additionally, taxpayers Howard Taylor and Michael Fairfield incurred moving expenses in 1976 in connection with the commencement of work at a new principal place of employment outside Wisconsin; these expenses were deductible under sec. 217 of the Internal Revenue Code.[2]

Following the law applicable to 1976 federal tax returns, the taxpayers wish to exclude the gains from the sales of their principal residences from their taxable income on their 1976 Wisconsin income tax returns and deduct their moving expenses.[3]

---

[1] Sec. 1034(a), IRC, provides as follows:

"Sec. 1034. **Rollover of gain on sale of principal residence**

"(a) Nonrecognition of gain.—If property (in this section called 'old residence') used by the taxpayer as his principal residence is sold by him and, within a period beginning 18 months before the date of such sale and ending 18 months after such date, property (in this section called 'new residence') is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale shall be recognized only to the extent that the taxpayer's adjusted sales price (as defined in subsection (b)) of the old residence exceeds the taxpayer's cost of purchasing the new residence.

[2] Sec. 217(a), IRC, provides:

"(a) *Deduction allowed.*—There shall be allowed as a deduction moving expenses paid or incurred during the taxable year in connection with the commencement of work by the taxpayer as an employee or as a self-employed individual at a new principal place of work."

[3] The taxpayers who were residents of Wisconsin in years prior to 1976 and for part of 1976 filed Wisconsin income tax returns

Although the Wisconsin income tax laws were "federalized" in 1965, the Wisconsin legislature has departed from the federal code in several respects. For Wisconsin income tax purposes state adjusted gross income is defined as federal adjusted gross income, "with modifications" prescribed in the state statutes.[4] Two statutory modifications of federal adjusted gross income, both relating to persons who "move" outside the state, give rise to this litigation.

Sec. 71.05(1)(a)5, Stats. 1975, provides that "gain on the sale or exchange of a principal residence, excluded under sec. 1034(a) of the Internal Revenue Code [is included in income taxable in Wisconsin] if the 'new residence' referred to therein is located outside the state."[5] In contrast, under the 1976 Wisconsin tax laws if the new principal residence were located in Wisconsin the gain would be deferred under federal and Wisconsin law.

for 1976. *See* sec. 71.01(1), Stats. 1975, which provides, in pertinent part:

"PERSONAL INCOME TAX. . . . For the purpose of raising revenue . . . there shall be assessed, levied, collected and paid a tax on all net incomes . . . by every nonresident natural person . . . upon such income as is derived from property located . . . within the state, and also by every nonresident natural person upon such income as is derived from performance of personal services within the state . . . ."

[4] Sec. 71.02(2)(e), Stats. 1975, states that " 'Wisconsin adjusted gross income' means federal adjusted gross income, with the modifications prescribed in s. 71.05(1) and (4)."

[5] Sec. 71.05(1)(a)5, Stats. 1975, provides for a modification relating to sale or exchange of a principal residence as follows:

"Some of the modifications referred to in s. 71.02(2)(c), (e) and (m) are:

"(a) Add:

". . .

"5. Gain on the sale or exchange of a principal residence, excluded under section 1034(a) of the internal revenue code, if the 'new residence' referred to therein is located outside this state."

Sec. 71.05(1)(a)7, Stats. 1975, provides that moving expenses incurred to move from the state of Wisconsin in connection with new employment, deductible under federal tax law, are not deductible for Wisconsin income tax purposes.[6] In contrast, moving expenses incurred to move within or into the state of Wisconsin in connection with new employment, deductible under federal tax law, are deductible for Wisconsin income tax purposes.

Estimates of the additional 1976 income tax owed by the taxpayers to Wisconsin attributable to taxation of the gain realized on the sale of the principal residences are as follows:

| *Taxpayer* | *Gain Realized* | *Tax* |
|---|---|---|
| Howard U. Taylor | $8,246.00 | $366.00 |
| Margaret Taylor | 8,246.00 | 426.00 |
| Wayne T. Feyereisen | 6,894.00 | 150.00 |
| Frances C. Feyereisen | 6,894.00 | 319.00 |
| James W. McCarville | 2,126.00 | 48.00 |
| Karen B. McCarville | 2,126.00 | 48.00 |
| Michael E. Fairfield | 6,479.00 | 300.00 |
| Donna J. Fairfield | 6,497.00 | 307.00 |

Estimates of the additional 1976 income tax owed by the taxpayers to Wisconsin attributable to the non-deductibility of the moving expenses are as follows:

| *Taxpayer* | *Expenses* | *Tax* |
|---|---|---|
| Howard U. Taylor | $6,488.00 | $300.00 |
| Michael Fairfield | 419.00 | 60.00 |

On June 8, 1977, the taxpayers commenced an action for declaratory relief in Dane county circuit court. They

---

[6] Sec. 71.05(1)(a)7, Stats. 1975, provides:

"Some of the modifications referred to in s. 71.02(2)(c), (e) and (m) are:

"(a) Add:

". . .

"7. Moving expenses incurred to move from this state."

contend that taxation of their gains and denial of their deductions of moving expenses constitute impermissible discrimination against non-residents. They seek a declaration that sec. 71.05(1)(a)5 and sec. 71.05(1)(a)7, Stats. 1975, are in violation of the privileges and immunities clause, Art. IV, sec. 2, of the United States Constitution.[7] Both the taxpayers and the Department of Revenue moved for summary judgment. The circuit court declared the statutes constitutional and dismissed the action. The court of appeals certified the appeal pursuant to sec. (Rule) 809.61, Stats. 1979, and we accepted the certification.

We shall first consider the analytical framework for review under Art. IV, sec. 2, the privileges and immunities clause, and then the constitutionality of each of the statutory provisions challenged.

## II.

Article IV, sec. 2, clause 1 of the United States Constitution provides: "The Citizens of each State shall be entitled to the Privileges and Immunities of Citizens in the several States."[8] By this clause the constitution ex-

[7] Although the taxpayers' briefs also refer to sec. 1 of Amendment 14, U.S. Const., which provides that "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States," the taxpayers do not discuss or rely on the 14th Amendment. "[T]he relationship, if any, between the Privileges and Immunities Clause and the 'privileges or immunities' language of the Fourteenth Amendment is less than clear." *Baldwin v. Montana Fish and Game Comm'n*, 436 U.S. 371, 380 (1978).

[8] The principle that each state must generally treat residents of the sister states as it treats its own residents precedes the constitution. Varat, *State "Citizenship" and Interstate Equality*, 48 U. Chi. L. Rev. 487, notes 1–4 (1981).

For recent commentary on Art. IV, sec. 2, cl. 1, *see* Knox, *Prospective Applications of the Article IV Privileges and Immuni-*

pressly limits a state's power to discriminate against inhabitants of other states.[9] The purpose of the clause is "to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned . . . it inhibits discriminating legislation against them by other States . . . and it secures to them in other States the equal protection of their laws." *Paul v. Virginia*, 8 Wall 168, 180 (1868). The privileges and immunities clause " 'establishes a norm of comity', *Austin v. New Hampshire*, 420 U.S. 656, 660 (1975), that is to prevail among the States with respect to their treatment of each other's residents." *Hicklin v. Orbeck*, 437 U.S. 518, 523–24 (1978).[10]

---

*ties Clause of the United States Constitution*, 43 Mo. L. Rev. 1 (1978); Simson, *Discrimination Against Nonresidents and the Privileges and Immunities Clause of Article IV*, 128 U. of Pa. L. Rev. 379 (1979); Varat, *supra;* Comment, *The Supreme Court— 1977 Term*, 92 Harv. L. Rev. 1, 75–86 (1978).

[9] "[I]t has come to be the settled view that Article IV, sec. 2, does not import that a citizen of one State carries with him into another State fundamental privileges and immunities which come to him necessarily by the mere fact of his citizenship in the State first mentioned, but, on the contrary, that in any State every citizen of any other State is to have the same privileges and immunities which the citizens of that State enjoy. The section, in effect, prevents a State from discriminating against citizens of other States in favor of its own." *Hague v. CIO*, 307 U.S. 496, 511 (1939).

[10] The privileges and immunities clause is an equal protection clause for non-residents, and non-residents need special protection because they cannot vote. Ely, *Democracy and Distrust: A Theory of Judicial Review* 82–85 (1980).

The taxpayers in the case at bar were residents of Wisconsin and were, of course, represented in the legislative halls of this state.

Justice Marshall explained the need for a more "rigorous" standard of review under the privileges and immunities clause than under other constitutional provisions as follows:

"Since nonresidents are not represented in the taxing State's legislative halls, cf. *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S.

While the privileges and immunities clause speaks in terms of absolute equality between citizen and non-citizen, "it has not been suggested, however, that state citizenship or residency may never be used by a State to distinguish among persons." *Baldwin v. Montana Fish and Game Comm'n*, 436 U.S. 371, 383 (1978). The Supreme Court has recognized that because non-residents may present special problems for the administration of state laws, the state need not grant non-residents precisely the same rights it grants to residents. As Justice Blackmun said in *Baldwin v. Fish and Game*, 436 U.S. 371, 383 (1978), "[s]ome distinctions between residents and nonresidents merely reflect the fact that this is a Nation composed of individual States, and are permitted; other distinctions are prohibited because they hinder the formation, the purpose or the development of a single Union of those States."

---

522, 532–533 (1959) (BRENNAN, J., concurring), judicial acquiescence in taxation schemes that burden them particularly would remit them to such redress as they could secure through their own State; but 'to prevent [retaliation] was one of the chief ends sought to be accomplished by the adoption of the Constitution.' *Travis v. Yale & Towne Mfg. Co.*, 252 U.S. 60, 82 (1920). Our prior cases, therefore, reflect an appropriately heightened concern for the integrity of the Privileges and Immunities Clause by erecting a standard of review substantially more rigorous than that applied to state tax distinctions among, say, forms of business organizations or different trades and professions." *Austin v. New Hampshire*, 420 U.S. 656, 662–663 (1975).

The taxpayers do not assert that the two statutes in issue in the case at bar violate the equal protection, due process or commerce clause. They apparently have concluded that the statutes would pass the rational basis test. *Western & So. Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 667, n. 21, 101 S. Ct. 2070, 2082 (1981). In *WKBH Television Inc. v. Dept. of Revenue*, 75 Wis. 2d 557, 576–7, 250 N.W.2d 290 (1976), we observed that different standards of review may be applied to tax laws under the several applicable clauses of the federal constitution.

Cases under the privileges and immunities clause, like those under the commerce clause (with which the privileges and immunities clause was joined in the Articles of Confederation), raise issues of discrimination as well as issues of federalism. *Austin v. New Hampshire,* 420 U.S. 656, 662 (1975). The privileges and immunities clause expresses the accommodation of the principle of equality of rights of citizens and non-citizens with the needs and interests of the state as a sovereign entity and helps "fuse into one nation a collection of independent, sovereign states." *Toomer v. Witsell,* 334 U.S. 385, 395 (1948).[11]

The case at bar illustrates the conflicting values present in many disputes arising under the privileges and immunities clause. Wisconsin as an incident of its sovereignty has the power to raise revenue by taxation. But in levying a tax, Wisconsin must stay within the limits set by the federal constitution for the protection of individuals and national unity, *e.g.,* the commerce, due process, equal protection, and privileges and immunities clauses. *Western and So. Life Ins. Co. v. State Board of Equalization,* 451 U.S. 648, 655, 101 S. Ct. 2070, 2076 (1981).

Although the purpose of the privileges and immunities clause is well recognized, "the contours of Art. IV, sec. 2, cl. 1, are not well developed." *Baldwin v. Montana Fish and Game Comm'n,* 436 U.S. 371, 380 (1978). While the United States Supreme Court cases interpreting the privileges and immunities clause can be read in several ways, what appears to emerge from these cases is the use of a three-step inquiry when a state statute is challenged under the clause.

---

[11] The privileges and immunities clause serves the constitutional value of national unity. Laycock, *Taking Constitutions Seriously: A Theory of Judicial Review,* 59 Tex. L. Rev. 343, 362–363 (1981).

First, the court must analyze the distribution of the tax burden between citizens and non-citizens to determine whether the law disadvantages non-citizens.[12] For tax statutes, this means that no discrimination exists if the state secures a reasonably fair distribution of burdens between residents and non-residents. *Austin v. New Hampshire, supra,* 420 U.S. at 664; *WKBH Tele-*

[12] While the privileges and immunities clause speaks in terms of "citizens of each state," the terms citizen and resident have in recent years been " 'essentially interchangeable . . . for purposes of analysis of most cases under the Privileges and Immunities Clause.' " *Hicklin v. Orbeck,* 437 U.S. 518, 524 n. 8 (1978), quoting *Austin v. New Hampshire,* 420 U.S. 656, 662 n. 8 (1975). *See also Travis v. Yale & Towne Mfg. Co.,* 252 U.S. 60, 78–79 (1920) : "Of course the terms 'resident' and 'citizen' are not synonymous, and in some cases the distinction is important. [B]ut a general taxing scheme such as the one under consideration, if it discriminates against all nonresidents, has the necessary effect of including in the discrimination those who are citizens of other States . . . ." For privileges and immunities analysis purposes, however, there does not appear to be a meaningful distinction between "citizenship" and "residency."

Cl. 1, sec. 1, Amend. XIV, U.S. Const., speaks of citizens of the state as follows: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

The Wisconsin income tax statutes make a distinction between "residents" and "nonresidents," not between citizens and noncitizens. Anyone subject to the income tax laws not domiciled in Wisconsin at the end of his or her taxable year is a nonresident for tax purposes. *See* Wis. Adm. Code, TAX, sec. 2.01.

It may be possible for a Wisconsin resident to purchase a new principal residence outside the state and yet remain a resident of Wisconsin. The existence of such residents might mitigate the alleged discriminatory effect of the tax statute between residents and non-residents since residents as well as former residents would be taxed on gains from the sale of Wisconsin residences. Nevertheless, for purposes of analysis we assume that the Wisconsin law differentiates between non-residents and residents.

*vision Inc. v. Dept. of Revenue,* 75 Wis. 2d 557, 573, 574, 250 N.W.2d 290 (1977).

In 1976 sec. 71.05(1)(a)5 treated former residents differently from continuing residents by requiring the former residents to recognize their gains from the sale of the Wisconsin residence immediately, while permitting residents to defer taxation on their gains. In 1976, the Wisconsin law for the most part postponed rather than eliminated a resident's recognition of gain on the sale of a principal residence. In 1976 when these taxpayers sold their residences, sec. 121, Internal Revenue Code (which was in effect for Wisconsin tax purposes), provided that persons who were 65 years of age or older could exclude all gain (including deferred gain) from their adjusted gross income where the adjusted sale price was $20,000 or less; where the sale price exceeded this amount the excludable gain was proportionately reduced. In 1977 the sale price set forth in sec. 121 was increased to $35,000.

A statistical tabulation stipulated to by the parties shows that between approximately 44 percent and 70 percent of Wisconsin residents aged 65 or older owned homes in 1970. From this data the taxpayers argue that while in theory sec. 71.05(1)(a)5 ultimately produces substantial equality because all taxpayers are eventually taxed on the gain on the sale of their principal residences, in real life many Wisconsin residents will not be taxed on all of the gain since they will qualify for exclusion of gain.

The taxpayers also submit that $3.3 million is the estimated annual revenue derived by the state from nonresidents under sec. 71.05(1)(a)5. The taxpayers assert that this figure represents their burden under the statute.

Aside from this data the taxpayers do not submit any material to prove the extent of the disadvantage to themselves or to others similarly situated as of 1976.

There is no data showing the probability that a former resident will or will not make a nonqualifying sale of a new residence prior to qualifying for the exclusion under sec. 121, Internal Revenue Code.

Although the taxpayers' proof of significant disadvantage is weak in light of the limited avoidance of gain available to residents in 1976, we recognize that changes in the Wisconsin law occurred after 1976 that made it more likely that Wisconsin residents who had deferred gain in 1976 and still owned a home in 1979 could totally avoid taxation on the deferred gain.

Beginning with taxable year 1979 Wisconsin adopted the federal once-in-a-lifetime exclusion of $100,000 of gain on the sale of a principal residence by a person aged 55 or older. Sec. 71.02(2)(b)3, 5, Stats. 1979–80. This 1979 change in the state law increases the likelihood that many Wisconsin residents will never have to pay Wisconsin income tax on the gains deferred on the sale of their principal residences.

The Wisconsin legislature recognized that the 1979 change made sec. 71.05(1)(a)5, which taxes Wisconsin residents under 55 years of age on the gain of their residences in Wisconsin when moving out of state, inequitable. A memorandum to the legislature's Joint Committee on Finance considering repeal of sec. 71.05(1) (a)5 explained that the principal argument for repeal is that no tax is imposed, except in rare cases, when the new residence is in Wisconsin, because the capital gains exclusion of $100,000 adopted for 1979 eliminates the substantial majority of homeowners in Wisconsin from taxation on the sale of a principal residence. The memorandum points out that sec. 71.05(1)(a)5 creates a hardship for employees who may be transferred from Wisconsin and that the tax may discourage employers from locating in Wisconsin. Memorandum dated April 21, 1981, to members of the Joint Committee on Finances, from Bob Lang, Director Legislative Fiscal Bureau, Re:

1981–83 Biennial Budget. Individual Income Tax—Capital Gains Treatment, p. 19.

Sec. 71.05(1)(a)5 was repealed for taxable year 1982 and thereafter.[13] Thus for taxable year 1982 if the new principal residence is located outside the state, the gain is excluded from Wisconsin taxable income. There does not appear to be a provision to tax this deferred gain at the later sale of the new principal residence.

Despite the deficiencies in the record, we shall assume, for purposes of analysis, that the disadvantage to the taxpayers resulting from sec. 71.05(1)(a)5 is not so insignificant that it can be ignored.

Because we assume the statute in practical effect unequally burdens non-residents, the taxpayers contend that we need not continue our analysis of the statute any further and that we should declare the statute unconstitutional. They claim that *Austin v. New Hampshire*, 420 U.S. 656, (1975), requires the courts to declare a state tax statute void under the privileges and immunities clause if the challenger shows that there is no "substantial equality of treatment for the citizens of the taxing State and nonresident taxpayers." *Id.* 420 U.S. at 665.

The taxpayers misconstrue *Austin.* At issue in *Austin* was a New Hampshire "commuter income tax" that effectively taxed non-residents on income earned in New Hampshire while exempting residents from taxation on income earned in New Hampshire. The New Hampshire tax in *Austin* was declared unconstitutional not merely because residents and non-residents were treated dif-

---

[13] Sec. 1090fb, Ch. 20, Laws of 1981, provides:

"71.05(1)(a)5 of the statutes is amended to read:

"71.05(1)(a)5 *For taxable years prior to 1982* gain on the sale or exchange of a principal residence, excluded under section 1034 (a) of the internal revenue code, if the 'new residence' referred to therein is located outside this state."

ferently but because the state had no justification for taxing the income of non-residents while exempting the income of residents. New Hampshire apparently relied solely on the unpersuasive argument that "the ultimate burden imposed [on non-residents] is not more onerous in effect." *Austin* at 666. If the taxpayers' position were adopted, even a compelling state interest would not sustain a tax that unequally burdens residents and non-residents. The proscription of the privileges and immunities clause is not that rigid. See *Salorio v. Glaser,* 82 N.J. 482, 414 A.2d 943, 952–53, *cert. denied* 449 U.S. 874 (1980).

Since we assume that sec. 71.05(1)(a)5 might disadvantage non-residents, we must move to the second step in the privileges and immunities analysis: a determination of whether the discrimination violates a fundamental right. The fundamental rights criterion has had a checkered history in the cases; sometimes it has been used by the Court, other times it has been ignored. Compare *Corfield v. Coryell,* 6 F. Cas. 546, 551 (No. 3, 230) (CCED Pa. 1823); *Paul v. Virginia,* 8 Wall 168 (1868); *Hague v. C.I.O.,* 307 U.S. 496, 511 (1939); *Mullaney v. Anderson,* 342 U.S. 415 (1952); *Baldwin v. Fish and Game Comm'n,* 436 U.S. 371, 388 (1978); *Hicklin v. Orbeck,* 437 U.S. 518 (1978). See also Note, *Const'l Law—The Privileges and Immunities Clause of Article IV: Fundamental Rights Revived— Baldwin v. Fish and Game Comm'n, 436 U.S. 371 (1978),* 55 Wash. L. Rev. 461 (1980). In the wake of *Baldwin* and *Hicklin* the necessity of a determination that equality in taxation is a fundamental right is unclear. In any event, the right to equal treatment in taxation was set forth as one of the protected fundamental rights as

early as 1825.[14] More recently the United States Supreme Court has reaffirmed that the privileges and immunities "clause plainly and unmistakably secures and protects the right of a citizen of the state . . . to be exempt from any higher taxes or excises than are imposed by the State upon its own citizens." *Ward v. Maryland,* 12 Wall 418, 430 (1870), quoted with approval in *Travis v. Yale Towne Mfg. Co.,* 252 U.S. 60, 78 (1919). See also *Austin v. New Hampshire,* 420 U.S. 656, 661 (1975).

Since we assume in the instant case that the two income tax statutes challenged might disadvantage non-citizens and do involve a fundamental right, the third and last step in the analysis is to determine whether the state's discriminatory treatment of non-citizens is within or outside the bounds set by the constitution.

The United States Supreme Court, recognizing that the state may be justified in discriminating between resident and non-resident, has set forth the "substantial reason for the discrimination" test to determine the

---

[14] Justice Washington in *Corfield v. Coryell,* 6 F. Cas. 546, 551–552 (No. 3230) (CCED Pa. 1825), characterized several rights as fundamental privileges and immunities of citizens of the several states protected by the clause: "[p]rotection by the government; . . . [t]he right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the state."

In the century and a quarter following *Corfield* the courts evaluated statutes that discriminated against non-residents based on the effect of the discrimination on the exercise of the rights enumerated in *Corfield.* After *Toomer v. Witsell,* 334 U.S. 385 (1948), and until *Baldwin,* the fundamental rights analysis was not emphasized and appears to have been replaced by the "substantial reason for the discrimination" test.

constitutionality of the differential treatment. In *Toomer v. Witsell*, 334 U.S. 385, 396 (1948), the Court set forth the test as follows:

"Like many other constitutional provisions, the privileges and immunities clause is not an absolute. It does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States. But it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it. Thus the inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them. The inquiry must also, of course, be conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures."[15]

In *Hicklin v. Orbeck*, 437 U. S. 518, 525, 526 (1978), Justice Brennan writing for a unanimous court explained the *Toomer* test as follows: The privileges and immunities clause does not preclude disparity of treatment where there are valid independent reasons for the disparity. The privileges and immunities clause bars discrimination against non-citizens when there is no substantial reason for the discrimination beyond the fact that they are citizens of other states. A substantial reason for the discrimination does not exist " 'unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the [discriminatory] statute is aimed.' " *Id.* at 525–26. Moreover, even where there is such a problem "there must be a 'reasonable relationship between the danger represented by non-

---

[15] Professor Tribe summarizes the *Toomer* test as follows:

"[The] test permits disparate treatment of non-residents, but only where the very fact of their non-residence demonstrably creates problems for legitimate state objectives that cannot be remedied in less discriminatory ways." *American Constitutional Law* sec. 6–33, p. 410 (1978).

citizens as a class, and the . . . discrimination practiced upon them.' "[16]  *Id.* at 526, quoting *Toomer v. Witsell, supra,* 334 U.S. at 399. The means used by the state must be "closely tailored" to achieve the objective. *Id.* at 528.[17]

---

[16] Justice Brennan described this two-prong analysis as follows in his dissenting opinion in *Baldwin v. Montana Fish and Game Comm'n,* 436 U.S. 371, 402 (1978):

". . . Drawing from the principles announced in *Toomer* and *Mullaney,* a State's discrimination against nonresidents is permissible where (1) the presence or activity of nonresidents is the source or cause of the problem or effect with which the State seeks to deal, and (2) the discrimination practiced against nonresidents bears a substantial relation to the problem they present."

[17] Concomitant with the variety of phrasings of the analysis applicable to privileges and immunities challenges, there is a certain ambiguity in the Supreme Court cases concerning the burden of going forward with the evidence and the burden of persuasion of the challenger and the state. The level of scrutiny appropriate in privileges and immunities challenges falls somewhere between scrutiny for a rational relation and strict scrutiny. Under the rational relation test there is a presumption that the statute is constitutional, and the challenger of the statute has the burden of proof (production and persuasion). Under the strict scrutiny test, once the challenger demonstrates that the strict scrutiny test is applicable, the supporter of the statute must demonstrate that the law is necessary to protect a compelling state interest. *Dunn v. Blumstein,* 405 U.S. 330, 342 (1972); *Shapiro v. Thompson,* 394 U.S. 618 (1969).

Justice Brennan dissenting in *Baldwin* discussed the burdens on the challenger and state in a privileges and immunities case as follows: "Although a State has no burden to prove that its laws are not violative of the Privileges and Immunities Clause, its mere assertion that the discrimination practiced against nonresidents is justified by the peculiar problem nonresidents present will not prevail in the face of a prima facie showing that the discrimination is not supportable on the asserted ground." 436 U.S. at 402.

Justice Brennan, writing for the Court in *Hicklin,* discussed the burdens in a privileges and immunities case in the following language: "For although the statute may not violate the Clause if the State shows 'something to indicate that non-citizens constitute

While it is clear that the scrutiny under the privileges
and immunities clause required by the *Toomer* "sub-

a peculiar source of the evil at which the statute is aimed,' *Toomer
v. Witsell, supra,* at 398, and, beyond this, the State 'has no bur-
den to prove that its laws are not violative of the . . . Clause,'
*Baldwin v. Montana Fish and Game Comm'n,* 436 U.S., at 402
(Brennan, J. Dissenting), certainly no showing was made on this
record that non-residents were 'a peculiar source of the evil [the
statute] was enacted to remedy . . . ." 437 U.S. at 526.

Professor Tribe comments on the burden of proof in a privileges
and immunities case as follows: "The standard of review employed
in *Toomer* and *Bolton* [*Doe v. Bolton,* 410 U.S. 179 (1973)], char-
acterized by a shift in the burden of proof to the discriminating
state and by an insistence on a fairly precise fit between remedy
and classification, is almost as demanding as that elaborated by
the Warren Court in equal protection and first amendment strict
scrutiny." Tribe, *American Constitutional Law,* sec. 6–33, p. 411
(1978).

Another commentator, *The Supreme Court—1977 Term,* 92
Harv. L. Rev. 84 (1978), described the burden of proof rule estab-
lished in *Hicklin* as follows:

"[Justice Brennan in *Hicklin*] departed from the traditional
allocation of the burden of proof in cases arising under the clause.
Before *Hicklin,* the nonresident had the burden of disproving the
validity of the justifications offered by the state.[48] *Hicklin* places
a duty on the state to demonstrate a relationship between the
presence of nonresidents and the problem which the state purports
to alleviate. The shift of the burden of proof in this first prong
discards the presumption of constitutionality that a statute nor-
mally enjoys[49] and is inconsistent with Justice Brennan's position
in *Baldwin* that the state had this burden only after the non-
resident had made a '*prima facie* showing that the discrimination
is not supportable on the asserted grounds.'[50] While Justice Bren-
nan offered no explanation for this shift, it is consistent with his
concern for the individual's interest."

[48] See, *e.g., Mullaney v. Anderson,* 342 U.S. 415, 418–19 (1952).
*See also* Knox, *supra* note 2, at 17–18.

[49] *See, e.g., Mullaney v. Anderson,* 342 U.S. 415, 418 (1952).
Under the equal protection clause this presumption is lost after

stantial reason for the discrimination" test falls between the minimum scrutiny (rational relation to a legitimate state interest) and the strict scrutiny tests (necessary relation to a compelling state interest) used in equal protection analyses, the scrutiny is not, as some commen-

the statute has been found to operate against a suspect class. *See* p. 78 *supra.*

[50] 98 S. Ct. at 1870 (Brennan, J., dissenting).

Although the United States Supreme Court cases are not clear, we conclude that the challengers of the statutes in the case at bar bear the burden of producing evidence demonstrating the discriminatory effect of the statute on non-residents. If a discriminatory effect is shown, the state has the burden of producing "something to indicate that nonresidents constitute a peculiar source of evil at which the statute is aimed," *Toomer v. Witsell,* 348 U.S. at 398; *Hicklin v. Orbeck,* 437 U.S. at 526. If the state makes such a showing, the challengers have the burden of showing the discrimination is "not supportable on the asserted grounds," *Baldwin,* 436 U.S. at 402. The burden of persuasion as to the unconstitutionality of the statute remains at all times with the challenger. For an analysis of the presumption of constitutionality and the burden of persuasion in judicial review of the constitutionality of legislation, *see* Hurst, *Dealing with Statutes* c. 3 (1982); Hurst, *The Functions of Courts in the United States 1950–1980,* 15 Law & Soc. Rev. 401, 455–462 (1980–81).

The record before us is meager. The decision of the circuit court in the case at bar was made on a motion of summary judgment. All the facts are stipulated to and most of the facts stipulated are descriptions of the taxpayers and the gains they realized on the sales of their homes or their moving expenses. The stipulated facts specifically not related to the taxpayers or their returns before the court were: (1) In 1974 approximately 2,314 persons who owned principal residences in Wisconsin moved from the state and realized gains of approximately $14,100,000.00; (2) taxpayers moving from the state in 1976 reported approximately $23,200,000.00 in moving expenses to be included in Wisconsin income; and (3) statistics about Wisconsin residents over 65 years of age who own homes. Both the taxpayers and the state have been remiss in fulfilling their respective burdens. Despite the deficiencies in the record, we have been able to decide the merits of the case.

tators have said, the same level of scrutiny as applied in cases of gender-based discrimination, *i.e.*, that the means employed must be "substantially related to important governmental objectives."[18] We conclude that the Court in *Toomer* used the term "substantial" to refer to the relationship of the means to the end, not to the nature of the state's goal. Thus the *Toomer* test for constitutionality is whether the means employed bear a substantial relation to legitimate state objectives.[19]

Although our inquiry in any privileges and immunities case is "conducted with due regard for the principle that the states should have considerable leeway in analyzing local evils and in prescribing appropriate cures," *Toomer v. Witsell*, 334 U.S. 385, 396 (1948), apparently the states may have more leeway in the field of taxation than in other regulatory measures. The United States Supreme Court has said that its "review of tax classifications has generally been concomitantly narrow, therefore, to fit the broad discretion vested in the state legislatures. When a tax measure is challenged as an undue burden on an activity granted special constitutional recognition, however, the appropriate degree of inquiry is that necessary to protect the competing constitutional value from erosion." *Austin v. New Hampshire*, 420 U.S. 656, 662 (1975).

[18] *Stallard v. South Dakota Board of Bar Examiners*, (D.S.D. 1/5/82), 50 U.S.L.W. 2421 (1/26/82); Varat, *State "Citizenship" and Interstate Equality*, 48 U. Ch. L. Rev. 487, 514, n. 109 (1981); Note, *Hughes v. Oklahoma and Baldwin v. Fish and Game Comm'n: The Commerce Clause and State Control of Natural Resources*, 66 Va. L. Rev. 1145, 1146, n. 9 (1980); Note, *Constitutional Law—The Privileges and Immunities Clause of Article IV: Fundamental Rights Revived—Baldwin v. Fish and Game Comm'n, 436 U.S. 371 (1978)*, 55 Wash. L. Rev. 461, 479, n. 91 (1980).

[19] *See* Simson, *Discrimination Against Nonresident and the Privileges and Immunities Clause of Article IV*, 128 U. Pa. L. Rev. 379, 382, n. 18 (1979); Tribe, *American Constitutional Law*, sec. 6–33, p. 411, n. 17.

Against this background, we must determine whether the classification set forth in sec. 71.05(1)(a)5, Stats. 1975, bears a substantial relation to a legitimate state objective.

### III.

In the statute in issue in the case at bar, the state objective is to raise revenue by means of a tax system which equitably allocates the burden of taxation. The federal and Wisconsin authorities have decided, as a matter of tax and economic policy, to allow deferral of recognition of gain on the sale of a residence which is replaced by a new residence, because the gain is due in large measure to inflation, there has been only a change in the form of the investment, and the taxpayer should be able to use the proceeds of the sale, undiminished by taxes, to acquire a new residence. As explained previously, the tax is deferred until the disposition of the last residence and, if certain events occur, the tax on the gain may be avoided altogether.

In contrast with the federal government whose taxing power extends throughout the country, the taxing power of state governments is limited by state boundaries. Persons moving from one state to another or having transactions in several states, create difficulties for a state tax system. Each state must decide how to impose its tax burden on such persons and on such transactions in a way which comports with the state's limited jurisdiction to tax and which distributes the tax burden among the "multi-state" persons and the "full-time residents" as equitably as possible in a manner which is administratively feasible. Sec. 71.05(1) (a)5 is the means chosen by the Wisconsin legislature to accomplish these objectives. In 1976 the legislative justification for treating Wisconsin residents who ac-

quire new residences outside the state differently from those who acquire new residences within the state was twofold: First, the legislature was concerned that unless the gain was taxed immediately the state would lose jurisdiction to tax the gain realized on the sale of the Wisconsin residence when the taxpayer left the state. Second, the legislature was concerned with the administrative problems to the state and to the former residents which would arise if the state were forced to keep track of the former residents until the taxability of the "deferred gain" was conclusively determined.

Although the state does not argue that the justification for sec. 71.05(1)(a)5 is the state's lack of jurisdiction to tax the former resident's deferred gain at a subsequent sale of the new residence, this consideration was important to the legislature.[20] In 1953, in considering adoption of deferral of gain from the sale of owner-occupied residences,[21] the Taxation Committee of

[20] Although there have been many federal cases relating to the constitutionality of state taxation of business income under the commerce, equal protection and due process clauses, there have been few federal cases since the 1930's dealing with the constitutionality under Article IV of state taxation of personal income. Hellerstein, *Some Reflections on The State Taxation of a Nonresident's Personal Income*, 72 Mich. L. Rev. 1309, 1309–1311 (1974).

[21] Sec. 71.03(5), Stats. 1953, is the forerunner of sec. 71.05(1) (a)5, Stats. 1975, and provides, in part, as follows:

"(5) NONRECOGNITION OF GAIN FROM SALE OR EXCHANGE OF RESIDENCE. (a) If property in Wisconsin (hereinafter in this section called 'old residence') used by the taxpayer as his principal residence is sold by him and, within a period beginning one year prior to the date of such sale and ending one year after such date, property in Wisconsin (hereinafter in this section called 'new residence') is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale shall be recognized only to the extent that the taxpayer's selling price of the old residence exceeds the taxpayer's cost of purchasing the new residence."

the Wisconsin Legislative Council raised the question of whether deferral is feasible for the taxpayer who moves out of the state into a new residence because "his new residence is beyond the reach of Wisconsin taxing authority." The Committee decided "for jurisdictional reasons [that] the proposed non-recognition of gains would have to be confined to taxpayers who acquired and occupied a residence within the state within the prescribed time." Research Report of the Subcommittee on Simplification of the Income Tax Forms and Procedures, Taxation Committee, Wisconsin Legislative Council Report, Vol. VIII, Part 1, p. 37 (1953).

Similarly in 1981 when the legislature considered repealing—and did repeal—sec. 71.05(1)(a)5, a principal argument against repeal was that Wisconsin would lose its jurisdiction to tax former residents for that portion of gain that is attributable to Wisconsin, a result which would give these former residents an unfair tax advantage over residents. This position was expressed to the Joint Committee on Finances as follows:

"The principal argument against repealing the requirement that the new residence must be located within Wisconsin to qualify for tax deferral is that a gain has occurred, and equity in taxation requires that a tax be paid. Opponents of repeal of the current requirement believe that it is appropriate to tax residents who move out of state since the tax deferral would become permanent, and the state would lose its jurisdiction to tax the portion of gain that is attributable to Wisconsin. For example, a homeowner sells a $50,000 home, moves out of state and has a $10,000 deferred taxable gain. The taxpayer purchases a new residence out of state for $60,000, and five years later sells the home and does not purchase another. The taxpayer no longer qualifies for a federal tax deferral and is less than 55 years of age. Although the federal government has jurisdiction to collect the deferred taxes, Wisconsin does not. Opponents point out that if the taxpayer had remained in

Wisconsin, a tax would be imposed in this situation. In 1979, 8,114 Wisconsin taxfilers reported $63.7 million in gains from the sale of in-state personal residences. Finally, it is argued that homeowners have received, in recent years, substantial real gains on residences and that the taxpayers who would benefit from the change may have large gains. For tax year 1979, 2,761 taxfilers reported $38.6 million in gains from the sale of residences when the new home is located outside the state. The mean gain for this year was $13,970." Memorandum dated April 21, 1981, to members of the Joint Committee on Finances, from Bob Lang, Director Legislative Fiscal Bureau, Re: 1981–83 Biennial Budget, Individual Income Tax—Capital Gains Treatment, p. 20.

In our federal system all persons do not have the same jurisdictional relationship to the taxing state, and embodied in federal due process is the concept that the state's taxing power is confined to persons, events and things within the state's jurisdiction.[22] The resident-soon-to-be-non-resident and the sale of Wisconsin real estate are subjects of taxation within this state's power to tax. If the gain of the resident-soon-to-be-non-resident on the sale of the Wisconsin residence is deferred and taxed on the subsequent sale, the event giving rise to taxation (the sale of out-of-state property by a non-resident) and the measure of the tax (the gain recognized from the out-of-state sale) occur outside Wisconsin. Whether a nexus sufficient to satisfy the due pro-

[22] *See* Hellerstein & Hellerstein, *State and Local Taxation— Cases and Materials* (4th ed. 1978) ; Hellerstein, *Some Reflections on the State Taxation of a Nonresident's Personal Income*, 72 Mich. L. Rev. 1309 (1974) ; Loronides, *Spurious Conceptions of the Constitutional Law of Taxation*, 47 Harv. L. Rev. 628 (1934) ; Note, *Multi-State Taxation of Personal Income*, 111 U. Pa. L. Rev. 974 (1963).

For a discussion of jurisdiction to tax, *see Department of Revenue v. Howick*, 100 Wis. 2d 274, 286, 297–99, 303 N.W.2d 381 (1981) (Abrahamson, J. concurring).

cess requirement of the fourteenth amendment exists between the state and the subsequent sale of the residence is unclear. *Cf. Northwest Airlines Inc. v. State,* 77 Wis. 2d 152, 252 N.W.2d 337 (1976) ; *Moore Motor Freight Lines Inc. v. Dept. of Taxation,* 14 Wis. 2d 377, 111 N.W.2d 148 (1961) ; *Soo Line Ry. Co. v. Dept. of Revenue,* 89 Wis. 2d 331, 278 N.W.2d 487 (Ct. App 1979).

Given this problem the legislature was appropriately concerned that unless it taxed the former residents immediately they would escape all Wisconsin tax on the gain, while persons continuing to reside in Wisconsin would not necessarily escape all Wisconsin taxation on the deferred gain.[23] The privileges and immunities clause protects the non-resident "against discriminatory taxation, but gives him no right to be favored by discrimination or exemption. See *Ward v. Maryland,* 12 Wall 418, 430." *Shaffer v. Carter,* 252 U.S. 37, 53 (1919). *Cf. WKBH Television Inc. v. Dept. of Revenue,* 75 Wis. 2d 557, 250 N.W.2d 290 (1977) ; *Simanco, Inc. v. Dept. of Revenue,* 57 Wis. 2d 47, 203 N.W.2d 648 (1973). By denying deferral to the former resident, Wisconsin treats resident and former resident as fairly as possible within our federal system.

We need not, and do not, decide whether the requisite nexus would exist if Wisconsin attempted to tax the deferred gain of the former resident on the sale of a residence in a sister state. It is sufficient in this case to acknowledge that the state's concern about the constitutionality of taxing a former resident has some merit

---

[23] If Wisconsin were to tax the deferred gain on the subsequent sale, the former resident would probably have no other taxable income in Wisconsin and would therefore pay less tax under the progressive income tax than does a resident taxpayer.

and that the state's endeavors to tax residents and former residents equitably on the gains from the sales of their Wisconsin residences are evidenced in the legislative history of sec. 71.05 (1) (a) 5.

It is thus apparent that differential treatment of new residences inside or outside the state has a substantial relation to a legitimate state objective, that of raising revenue, and to the state's power to tax and to achieve equality among taxpayers.

The state and the taxpayers focus on the state's asserted justification for sec. 71.05 (1) (a) 5, namely administrative convenience. According to figures supplied by the Wisconsin Department of Revenue, in 1974, 2,314 persons who owned principal residences in Wisconsin moved from the state and realized gains on the sales of principal residences in Wisconsin of approximately $14,-100,000.00, taxable under sec. 71.05 (1) (a) 5, Stats. 1975. The circuit court concluded that it would be difficult for the Department of Revenue to determine when former residents sell their new residences outside the state and when they are no longer eligible to defer gain. The circuit court explained:

"In this case, the statute is aimed at taxpayers whose purchase of a home in a new state makes it difficult to know when a nonqualifying sale has been made. 'All the state has done by virtue of sec. 71.05 (1) (a) 5, Stats. (1975), . . . is adopt a convenient substitute for deferring recognition of the gain on the sale of a residence by a nonresident until he has long since left the state, his whereabouts are unknown, and it is difficult to ascertain when he has finally made a nonqualifying sale of his residence." (Defendant's brief, p. 8) Unlike taxpayers who move from the state, those who remain in Wisconsin continue to be subject to such Wisconsin laws as make discovery of their final, nonqualifying sale possible. The Court finds that this constitutes a

valid independent reason for the different treatment accorded residents and nonresidents, and that the statutory provisions are substantially related to the problem presented." *Memorandum Decision,* at 14.

The taxpayers argue that the state's concern for administrative convenience does not justify the discrimination, because there are less discriminatory alternatives available to the state. As noted above the substantial relation test is not the same as the strict scrutiny test. Therefore, the state need not employ the least intrusive or least burdensome alternative. Nevertheless that less intrusive alternatives exist is probative of the substantiality of the relation of the challenged statute to the state's objective. Thus, we will discuss the alternatives proposed by the taxpayers.

The taxpayers suggest that the state either forgo taxing gains from the sale of residences altogether or deny deferral to everyone and tax both residents and non-residents on the gain. The federal constitution does not necessarily require a state to forgo taxation or to deny its residents deferral of gain simply because those who move from the state may be treated differently than residents. Differential treatment of residents and non-residents may be justified when the state cannot eliminate the dissimilarity without impairing its ability to raise taxes effectively or where the goal of the tax law cannot be served by an alternate approach.

The taxpayers also suggest that the state may permit all former residents to defer gain on the sale of their residences and require them to file annually with the Department of Revenue their federal income tax returns or other information so that the Department can determine whether a sale of the new residence has been made which triggers taxable gain. Even if we assume that Wisconsin has jurisdiction to tax a nonqualifying sale by

a non-resident of real estate in another state, such a procedure might prove burdensome to the former residents as well as to the state of Wisconsin. The Department of Revenue would have to obtain and review annually information from numerous former residents spread across the country. If approximately 2,300 persons who have a deferred gain leave the state each year, in 1982 the Department of Revenue would review approximately 13,000 returns relating to sales of Wisconsin residences from 1976 to 1981. If the taxpayers' suggestion were implemented, the result would be a Wisconsin Department of Revenue operating on a national basis, conducting audits and instituting collection proceedings throughout the United States. In any event, Wisconsin is not required to shoulder the substantial burden envisioned in this suggestion to avoid possible discrimination against former residents.

Finally the taxpayers suggest that the residents file a bond for the amount of the tax liability with the Department in the year they move from Wisconsin. The practical and legal difficulties of enforcing such a measure are apparent on the face of the suggestion. Requiring a bond from everyone leaving the state who qualifies for deferral of gain would, of course, be subject to challenge under the commerce clause as well as the privileges and immunities clause of the federal constitution. Such a requirement would impose a substantial time and cost burden on the former residents.

We view each of these "less discriminatory alternatives" suggested by the taxpayers as imposing a substantial burden on the state and on the former residents. None of the alternatives is closely tailored to achieve the state's objectives of raising revenue, equal taxation and administrative efficiency. None of the alternatives demonstrates that the problems created by former resi-

dents can be remedied in a better "tailored" manner than that chosen by the legislature.

Having considered the nature of the disparate treatment accorded non-residents, the justification offered to support the disparity, the role of this state vis-a-vis sister states and the federal government, and the nature of the relation of the state to its residents and its non-residents, we conclude that there is a substantial relationship between the problems caused by former residents for the state in achieving the state's tax objectives and the burden placed on non-residents by sec. 71.05(1)(a)5, and we conclude that the constitutional value of interstate equality of citizens and non-citizens is not eroded by the Wisconsin law. Accordingly, we hold that sec. 71.05(1)(a)5 does not contravene the privileges and immunities clause of Article IV, sec. 2 of the federal constitution.

## IV.

Two of the taxpayers challenge the constitutionality of sec. 71.05(1)(a)7, Stats. 1975, which denies them a deduction from their Wisconsin taxable income for moving expenses incurred in commencing employment outside Wisconsin. The taxpayers contend the statute creates an unjustified burden on former residents.

We are unpersuaded by the taxpayers' contention. The United States Supreme Court in *Shaffer v. Carter*, 252 U.S. 37 (1920), clearly established that a state need not grant a non-resident deduction of expenses incurred in connection with the production of income outside the taxing state since the taxing state has no jurisdiction to tax the income. The Supreme Court concluded that the different treatment of residents and non-residents

as to deductions related to the production of income outside the taxing state is substantially related to the state's power to tax and raise revenue and therefore cannot be regarded as unjustifiable under the privileges and immunities clause. The Court said:

"Appellant contends that there is a denial to noncitizens of the privileges and immunities to which they are entitled, and also a denial of the equal protection of the laws, in that the act permits residents to deduct from their gross income not only losses incurred within the State of Oklahoma but also those sustained outside of that State, while non-residents may deduct only those incurred within the State. The difference, however, is only such as arises naturally from the extent of the jurisdiction of the State in the two classes of cases, and cannot be regarded as an unfriendly or unreasonable discrimination. As to residents it may, and does, exert its taxing power over their income from all sources, whether within or without the State, and it accords to them a corresponding privilege of deducting their losses, wherever these accrue. As to nonresidents, the jurisdiction extends only to their property owned within the State and their business, trade, or profession carried on therein, and the tax is only on such income as is derived from those sources. Hence there is no obligation to accord to them a deduction by reason of losses elsewhere incurred." *Id.* at 56–7.

Professor Walter Hellerstein concluded that it is both settled and sensible law for a state to limit the non-resident's deductions to those incurred in connection with the production of income taxable within the state. He explains as follows:

"*Shaffer v. Carter* [252 U.S. 37, 56–57 (1920)] established and *Travis v. Yale & Towne Manufacturing Co.* [252 U.S. 60, 75–76 (1920)] reiterated the principle that a state may limit the nonresident's deduction of expenses, losses, and the like to those incurred in connection with the production of income within the taxing

state. At least insofar as the expenses relate to the nonresident's efforts to earn income, the proposition is eminently reasonable, because the state's jurisdiction to tax such income is similarly confined. Most state income tax statutes specify the criteria and methods the nonresident taxpayer must follow in allocating or apportioning to the taxing state expense deductions associated with income producing activities in that state. While the relation of a particular expense item to activity in the taxing state may present troublesome factual questions, the controlling legal doctrine is both settled and sensible." (Notes omitted.) Hellerstein, *Some Reflections on the State Taxation of a Nonresident's Personal Income,* 72 Mich. L. Rev. 1309, 1346 (1974).

Since Wisconsin does not tax income earned by former residents in their new domicile, we conclude that Wisconsin has no constitutional obligation to allow deductions for expenses incurred to generate income that is beyond its taxing jurisdiction. See *Harris v. Comm'n of Revenue,* 257 N.W.2d 568 (Minn. 1977).

For the reasons expressed, we conclude that neither statutory provision contravenes Art. IV, sec. 2, the privileges and immunities clause of the federal constitution.

*By the Court.*—Judgment affirmed.